**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **STEPHENSON OIL COMPANY,** | ) | |
| **on behalf of itself and all others similarly** | ) | |
| **situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No.  08-CV-380-TCK-TLW** |
| | ) | **BASE FILE** |
| | ) | |
| **CITGO PETROLEUM CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |
| | ) | |
| **E&M OIL COMPANY, INC., on behalf of** | ) | **Case No. 09-CV-36-TCK-TLW** |
| **itself and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CITGO PETROLEUM CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are Defendant Citgo Petroleum Corporation's Motion to Dismiss Amended Complaint of Stephenson Oil Company (Doc. 38) and Defendant Citgo Petroleum Corporation's Motion to Dismiss the Complaint of E&M Oil Company, Inc.  (Doc. 89).

**I.      Procedural History and Factual Background**

On June 30, 2008, Plaintiff Stephenson Oil Company ("Stephenson") filed a class action Complaint on behalf of itself and others similarly situated against Defendant Citgo Petroleum Corporation ("Citgo") in Case No. 08-CV-380-TCK-TLW.   Stephenson filed an Amended Complaint ("Amended Complaint") on September 22, 2008.  Citgo subsequently moved to dismiss the Amended Complaint and also moved to stay all deadlines pending the Court's ruling on the

motion to dismiss.  The Court denied Citgo's motion to stay all deadlines and rejected Citgo's alternative proposal to limit discovery to class-certification issues.[1]

On January 23, 2009, Plaintiff E&M Oil Company Inc. ("E&M") filed a class action Complaint on behalf of itself and others similarly situated against Citgo in Case No. 09-CV-36-TCK-TLW.  E&M's Complaint is virtually identical to Stephenson's Amended Complaint.  On February 24, 2009, pursuant to an unopposed motion to consolidate filed by Stephenson and E&M, the Court consolidated Case Nos. 08-CV-380 and 09-CV-360 for all purposes pursuant to Federal Rule of Civil Procedure 42(a).   On March 2, 2009, Citgo filed a motion to dismiss E&M's Complaint, which incorporated all arguments made in Citgo's motion to dismiss Stephenson's Amended Complaint.  Both of Citgo's pending motions to dismiss ("Motions to Dismiss") are ripe for determination.

The following facts are contained in Stephenson's Amended Complaint and E&M's Complaint.[2]  Citgo refines crude oil into gasoline and sells the refined gasoline on the wholesale level of the distribution chain.  After refining the crude oil, Citgo transfers it by pipeline and barge to approximately fifty-four wholly or jointly owned "terminals" located east of the Rocky Mountains.[3]  Unlike several other major oil companies, Citgo does not own, operate, or lease its own

---

[1]  Under the current Scheduling Order (Doc. 148), a class certification hearing is scheduled for January 7, 2010, and trial is scheduled for July 19, 2010.

[2]  Unless otherwise necessary for identification, the Court refers to Stephenson and E&M collectively as "Plaintiffs."  Unless otherwise necessary for completeness or clarification, the Court cites to Stephenson's Amended Complaint in setting forth Plaintiffs' allegations.

[3]  "Terminal" is a term of art used in the gasoline industry.  *See, e.g., Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 285 (4th Cir. 1998) (explaining that defendant "is a large petroleum refiner and gasoline wholesaler that sells gasoline at terminals throughout the country, including a terminal located in North Augusta, South Carolina").

retail stations.   Instead, it distributes its gasoline through independent Citgo distributors ("Distributors"), which Citgo denominates as "franchisees" or "franchise marketers."  Distributors either sell the gasoline to the public through their own stations or to owners of Citgo stations who resell the gasoline to the public.  Distributors compete within their geographical region for the business of independent retail station owners for whom they seek to become suppliers.  Distributors also compete for retail business to the extent that they operate branded Citgo gasoline stations.

Citgo has entered into Marketer Franchise Agreements ("MFAs") with Distributors in the form attached as Exhibit A to Stephenson's original Complaint.  (*See* Marketer Franchise Agreement between Citgo and Stephenson, Compl. at Ex. A.)[4]  Paragraph 4 of the MFAs is entitled "Prices" and provides:

> Marketer shall pay CITGO's Marketer prices in effect at the time and place of delivery.  Such prices will be established by CITGO on an FOB, terminal basis, or other point of sale basis, including, upon mutual agreement, on a delivered basis.

(*Id.* ¶ 4) ("MFA Open Price Term").  At material times, the sales term "FOB, terminal basis" required (1) Citgo to make delivery of its gasoline to its terminals, and (2) Distributors to bear the necessary expense of providing tanker trucks to pick up the gasoline from the respective Citgo terminal and transport that gasoline to retail outlets for ultimate sale to the public.  The sales price for purchases made on an "FOB, terminal basis" is commonly known as the "rack price."[5]  Citgo

---

[4]  The MFAs refer to Distributors as "Marketers."

[5]  The "rack price" is a term of art in the gasoline industry that refers to the price paid by a purchaser who "transports the gasoline to one or more retail outlets, either with its own equipment or through a subcontractor."  *See Tom-Lin Enter. v. Sunoco, Inc.*, 349 F.3d 277, 279 (6th Cir. 2003).  The rack price is generally lower than the price charged to a purchaser who has the gasoline delivered to it; this higher price is commonly referred to as a "Dealer Tank Wagon" or "DTW" price.  *See id.* at 285; *see also Havird Oil Co., Inc.*, 149 F.3d at 285 (explaining that a "posted Wholesale Reseller Price" at a given terminal is known as the "rack price").

incurs the identical expense for each gallon of gasoline produced, transported, and then sold at any given terminal. Stephenson purchased Citgo gasoline from the Williams Terminal in Tulsa, Oklahoma, which is presently operating as the Magellan Terminal. E&M purchased Citgo gasoline from terminals located in Oklahoma City, Wynnewood, and Ardmore, Oklahoma and Wichita Falls, Texas.

Citgo and other major oil companies publicly post their wholesale rack prices, by gallon and grade, on a daily basis for each terminal. These prices are published by reporting services known as "OPIS" and "Platts." According to Plaintiffs, "[t]he practice of selling gasoline on a wholesale level utilizing an open price term, setting the specific rack price at each terminal by grade on a daily basis, and then publishing the price for each terminal was, and continues to be, the standard commercial practice in the gasoline industry." (Am. Compl. ¶ 20.) Further, it is standard for sellers to "offer the wholesale price at each terminal on a non-discriminatory basis, *i.e.*, each distributor purchasing the same gasoline product on the same date at the same terminal would be charged the same price." (*Id.* ¶ 21.)

Plaintiffs allege that, contrary to industry standards, Citgo engaged in a price-discrimination scheme among Distributors that was designed to maximize its own profits. Generally, if Citgo wanted to increase sales in a certain area, it could do so by lowering its posted rack price for the terminal at that location, thereby luring business from other oil companies. However, if it lowered its rack price, it faced a possible reduction in price by a competitor that could negate the desired increase in sales and reduce profit margins. Plaintiffs allege that Citgo engaged in the following price-discrimination scheme to increase its sales volume without lowering its publicly posted rack price:

4

Citgo implemented a practice whereby it secretly and selectively lowered the sales price to a select small group of distributors below the publicly posted rack price (the "Favored Distributors") to allow these favored distributors to increase their sales of Citgo gasoline, while maintaining the publicly posted rack prices for sales to others (the "Disfavored Distributors"). The Favored Distributors' [MFAs] originally had the same open-price term as the Disfavored Distributors, so that all distributors competed on a level field. Under these [MFAs] the distributor price charged to all independent distributors was the posted rack price at any given terminal. Subsequently, by virtue of an amendment to their [MFAs], referred to by Citgo as "formula pricing," the Favored Distributors became the beneficiaries of a net price per gallon price that was lower than the rack price. This was done by Citgo despite the fact that Citgo had contracted with all of its independent distributors, both favored and disfavored, to charge the distributor price at any given terminal. Moreover, the terms of Citgo's pricing formula were kept secret, so the Disfavored Distributors could not learn how they were suffering from Citgo's price discrimination. . . . While Citgo continued to charge the Disfavored Distributors the posted rack price for branded CITGO gasoline purchases, the rack price no longer served as the "distributor price" at those terminals because the Favored Distributors received a lower price for purchases at the same terminals. In fact, the posted rack price was higher than prices offered to the Favored Distributors. As a result, Citgo systematically overcharged [Disfavored Distributors] millions of dollars over the class period by selling branded Citgo gasoline at a rack price that no longer represented the distributor price. . . . The price reduction provided to Favored Distributors was not based upon the quantity of gasoline to be supplied by them to any particular retail location or the number of years where any retail location being supplied by any Favored Distributor committed to remain branded as a Citgo station.

(Am. Compl. ¶¶ 25-26, 28, 31.)  Stephenson alleges to be in direct competition with at least one Favored Distributor named Modern Oil Co. ("Modern Oil") and alleges that it and Modern Oil purchased Citgo gasoline from the same terminal.  (*See id.* ¶ 33.)  E&M alleges to be in direct competition with at least one Favored Distributor named Susser Petroleum Co. ("Susser") and alleges that it and Susser purchased Citgo gasoline from the same terminal.  (*See* E&M Compl. ¶ 33.)

According to Plaintiffs, this pricing scheme promoted Citgo's overall business strategy, as set forth in certain internal documents such as a strategic plan known as "TBT/IMP."  Under this plan, Citgo would identify terminals that offered the highest rate of return on Citgo's assets, target

these terminals, and attempt to increase sales volume at these terminals.  Citgo allegedly did so in this case by providing the Favored Distributors the secret lower formula prices to undercut the competition, while using the Disfavored Distributors to maintain the highest profit margin possible at each terminal.  In addition, Plaintiffs allege that, as explained in certain internal documents, Citgo underwent a general change in business strategy whereby Citgo "planned to cut its sales nearly in half, to match its own production and no longer purchase from others to meet the needs of its distributors." (*Id.* ¶ 45.)  Based on this change, the branded retail locations became expendable, and "Citgo could utilize its preferred pricing without regard to the economic harm to the Disfavored Distributors." (*Id.* ¶ 47.)

In the Amended Complaint, Plaintiffs assert a single cause of action for breach of contract. Plaintiffs contend that Citgo's pricing practices breached the MFAs because such practices "violate reasonable commercial standards of fair dealing" in the gasoline trade and because Citgo's "pricing was committed in bad faith." (Am. Compl. ¶¶ 36-37.)  Although there is no express provision of the MFAs requiring compliance with reasonable commercial standards or requiring good faith, the Uniform Commercial Code ("UCC"), as adopted in Oklahoma, requires a seller to exercise good faith in setting an open-price term. *See* Okla. Stat. tit. 12A, § 2-305(2) ("A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."); *see also infra* Part III.  In their responses to the Motions to Dismiss, Plaintiffs make clear that their breach of contract claim is based on Citgo's failure to set the MFA Open Price Term in good faith, as required by § 2-305(2).  (*See* Resp. to Mot. to Dismiss Am. Compl. 10-17.)  Citgo moved to dismiss the breach of contract claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' allegations fail to state claim upon which relief can be granted.

## II.      Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the

plaintiff has stated a claim upon which relief may be granted.  The inquiry is "whether the complaint

contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Ridge at Red Hawk,*

*LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).   In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must

"'nudge [ ] [his] claims across the line from conceivable to plausible.'"  *Schneider*, 493 F.3d at 1177

(quoting *Twombly*, 127 S. Ct. at 1974).  Thus, "the mere metaphysical possibility that some plaintiff

could prove some set of facts in support of the pleaded claims is insufficient; the complaint must

give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual

support for these claims."  *Schneider*, 493 F.3d at 1177.  The Tenth Circuit has clarified that

"plausible," the term used by the Supreme Court in *Twombly*, does not mean "likely to be true."

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008).  Instead, "'plausibility' in this context must

refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide

swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line

from conceivable to plausible."  *Id.* (internal quotation marks omitted).   "The allegations must be

enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for

relief."  *Id.*

In conducting the Rule 12(b)(6) inquiry, a court must "assume the truth of the plaintiff's

well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Id.*; *see*

*also Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).  However,

a court need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154-55 (10th Cir. 2001) (citations omitted).

## III.    General Law - UCC § 2-305 [6]

The UCC, as adopted in Oklahoma, allows the enforcement of contracts that contain an "open price term," such as the MFA Open Price Term. *See* Okla. Stat. tit. 12A, § 2-305(1) ("The parties if they so intend can conclude a contract for sale even though the price is not settled.").[7] However, this discretionary price must ultimately be fixed by the relevant party "in good faith." *See id.* § 2-305(2) ("A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1319 (S.D. Fla. 1999) ("[A]lthough it may be agreed that one party has the discretionary authority to set an open price term, this discretion is circumscribed by the duty placed on the discretion-exercising party to set the price in good faith."). The duty to set open price terms in good faith "acts to preserve and control opportunistic behavior by requiring that the price be reasonable and set pursuant to reasonable commercial standards of fair dealing in the trade." *Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1319 (internal quotation marks omitted). An open price term that is not set in "good faith" gives rise to a cause of action for breach of the underlying contractual open-price provision rather than an independent cause of action. *See id.* (explaining that good faith is an interpretive tool to determine

---

[6] For purposes of this motion, it is not disputed that the MFAs contain an "open price" term, that the parties are "merchants" under the UCC, and that § 2-305's good-faith requirement applies to the MFAs.

[7] "In the usual case, a contract with a missing term would fail for indefiniteness, but [§ 2-305] serves to fill the gap and save the contract. *Havird Oil Co., Inc.,* 149 F.3d at 290.

the parties' expectations under the contract and does not create an independent duty divorced from the specific clauses of the contract).

Comment 3 to § 2-305 ("comment 3"), discussing the good-faith requirement specifically applicable to open-price terms,[8] provides:

> Subsection (2), dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103).  But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

(*Id.* § 2-305 cmt. 3.)  Courts have interpreted the third sentence of comment 3 as a "safe harbor" that applies when a defendant can show (1) it is a "normal" case, and (2) the allegedly "bad-faith" price is of a type listed, *e.g.*, a posted price, a given price, a price in effect, or a market price.  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 455 (5th Cir. 2002) ("The comment also creates a good faith safe harbor . . . when [merchants] use various sorts of fixed prices.  But this safe harbor is applicable only in the 'normal case.'").

Courts are divided on what constitutes a "normal" case for purposes of the safe harbor. Some courts have held that the only type of evidence that can take an otherwise commercially reasonable "posted price" out of the "normal case" is "some evidence that the refiner used pricing to discriminate among its purchasers."  *See, e.g., Shell Oil Co. v. HRN, Inc.*, 144 S.W.2d 429, 434

---

[8]  The UCC, as adopted in Oklahoma, also contains a general good-faith requirement, *see* Okla. Stat. tit. 12A, § 1-203, and a good-faith requirement where the particulars of performance are specified by one of the parties, *see id.* § 2.311(1).  These provisions are relevant to § 2-305(2) and are discussed in case law interpreting § 2-305(2).  *See, e.g., Allapattah Servcs., Inc.*, 61 F. Supp. 2d at 1318-25.

(Tex. 2004) (affirming district court's grant of summary judgment to defendant where price was "commercially in line with that charged by other refiners to their lessee dealers" although there was evidence that the price "may have been motivated by an improper underlying purpose to eliminate some dealerships"). These courts reason that § 2-305(2) contains no subjective element and that a seller's subjective, bad-faith intentions do not, standing alone, form the basis of a claim for bad-faith pricing where the plaintiff has been charged a commercially reasonable price. *See, e.g., id.* at 435 ("Although the subjective element of good faith may have a place elsewhere in the Code, we do not believe this subjective element was intended as a stand-alone basis for a claim of bad faith under section 2-305.") (internal citation omitted).

In contrast, other courts have held that "abnormality," for purposes of comment 3, goes beyond price discrimination and commercial unreasonableness. *See, e.g., Mathis*, 302 F.3d at 457. The court in *Mathis* explained:

> Although price discrimination was the type of aberrant case on the minds of the drafters, price discrimination is merely a subset of what constitutes such an aberrant case. *Any* lack of subjective, honesty-in-fact good faith is abnormal; price discrimination is only the most obvious way a price-setter acts in bad faith-by treating similarly-situated buyers differently.

*Id.* (emphasis added) (affirming jury verdict in favor of plaintiffs where, although price charged was a "price in effect" or DTW charge, plaintiffs presented evidence that DTW price was set at an uncompetitive level to drive franchisees out of business and replace their stores with company-operated retail stores). These courts reason that § 2-305(2) requires both objective and subjective good faith, such that an "objectively" or commercially reasonable price can violate § 2-305(2) if a plaintiff can show that such price was set with any type of improper or bad-faith motive. *See id.* at 455-56 ("[Comment 3 to § 2-305(2)] embraces both the objective (commercial reasonableness) and

10

subjective (honesty in fact) senses of good faith; objective good faith is satisfied by the 'price in effect' as long as there is honesty in fact (a 'normal case').");  *see also Marcoux v. Shell Oil Prod. Co.*, LLC, 524 F.3d 33, 50 (1st Cir. 2008) (rejecting defendants' argument that comment 3 creates an "absolute safe harbor for nondiscriminatory posted prices in open price term contracts" and reasoning that "a situation in which one merchant is raising its prices to force a customer out of business is hardly the 'normal case'").   Under this second line of cases, "a seller with the responsibility to fix a reasonable price does not act in subjective good faith when it engages in price discrimination - by treating similarly-situated buyers differently - *or* when the seller is otherwise motivated by an intent to injure the buyer."  *See Tom-Lin Enter.*, 349 F.3d at 279 (emphasis added) (discussing split in case law).

As evidenced by the above debate, although courts are divided as to the safe harbor's scope, all courts are in agreement that a discriminatory price does not fall within the safe harbor.  *Mathis*, 302 F.3d at 456 ("The drafter's solution was to avoid objective good faith challenges to prices set by reference to some 'price in effect,' while preserving challenges to discriminatory pricing.");  *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1346 -1347 (D. Kan. 1996) ("It is abundantly clear . . . that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent discriminatory pricing.");  *Shell Oil Co.*, 144 S.W.2d at 435 ("[The drafters of § 2-305] adopted a safe harbor, Comment 3's posted price presumption, to preserve the practice of using sellers' standard prices while seeking to avoid discriminatory prices.") (internal quotation marks omitted).

Thus, whatever "bad-faith" pricing means in the context of § 2-305, it certainly encompasses discriminatory pricing.[9]

## IV.    Motions to Dismiss

In the Motions to Dismiss, Citgo argues that Plaintiffs failed to state a claim for breach of contract.  Citgo essentially makes three arguments:  (1) Plaintiffs were charged the rack price, and such "posted price" falls into § 2-305(2)'s safe harbor; (2) Plaintiffs have not alleged facts sufficient to take this case outside the safe harbor, either by alleging (a) price discrimination, (b) commercial unreasonableness, or (c) subjective bad faith;[10] (3) Plaintiffs' claims are precluded by certain notice requirements in the UCC; and (4) Plaintiffs' claims are barred by the voluntary payment doctrine under Oklahoma law.

In their responses, Plaintiffs concede that Citgo charged Plaintiffs the rack price and that such rack price, which is akin to a "posted price," would ordinarily be protected by the safe harbor. Plaintiffs contend, however, that they have alleged facts that, if proven, would take this case outside the "normal case" such that the safe harbor does not apply.  Plaintiffs further contend that their claims are not precluded by the UCC's notice provisions or Oklahoma's voluntary payment doctrine.

---

[9] Despite the numerous cases explaining that a discriminatory price violates § 2-305(2)'s good-faith requirement, Citgo appears to urge the Court to hold otherwise.  (*See* Mot. to Dismiss Am. Compl. 11 ("[I]t is unclear why a judge-made exception to the statutorily-created safe harbor would be necessary to address price discrimination issues, especially when such issues are comprehensively covered by federal and state antitrust laws").)  However, even those cases relied upon by Citgo recognize that the drafters of § 2-305 intended to prevent sellers from discrimination in setting an open price term.  *See Shell Oil Co.,* 144 S.W.2d at 434-35.

[10] Citgo urges the Court to follow those cases holing that there is no subjective component to the § 2-305(2) inquiry.  Alternatively, Citgo argues that Plaintiffs have failed to allege any subjective bad faith.

A.      Have Plaintiffs Stated a Claim for "Abnormality" Under Comment 3?

As framed by Citgo in its Motions to Dismiss, and supported by relevant case law, there are at least three possible methods of alleging abnormality under comment 3: (1) price discrimination; (2) commercial unreasonableness; or (3) subjective bad faith.  *See Yonaty v. Amerada Hess Corp.*, No. 304CV605, 2005 WL 1460411, at *5 (N.D.N.Y. June 20, 2005) (unpublished) ("Although courts have adopted varying approaches in analyzing whether gasoline franchisors have set prices in good faith, it is clear that, in order for Plaintiff to maintain a claim under any of these approaches, he must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees.") Price discrimination and commercial unreasonableness are widely accepted types of abnormality, while subjective, bad-faith intent is a more controversial type of abnormality. *See infra* Part III.

1.      *Price Discrimination*

The most widely recognized method of alleging an "abnormal" case under the third sentence of comment 3 to § 2-305 is by alleging price discrimination.  In the context of § 2-305(2), discriminatory pricing means "charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Wayman*, 923 F. Supp. at 1347.  The "two buyers" at issue must be "similarly situated." *Tom-Lin Enter.*, 349 F.3d at 281 (explaining that a seller engages in price discrimination "by treating similarly-situated buyers differently");  *Bob's Shell, Inc. v. O'Connell Oil Assocs., Inc.*, No. Civ.A.03-30169, 2005 WL 2365324, at * 5 (D. Mass. Aug. 31, 2005) (unpublished) (price discrimination must occur between "similarly situated buyers").

13

Citgo argues that Plaintiffs' price discrimination theory fails as a matter of law because Plaintiffs have failed to allege the existence of a "similarly situated buyer that supposedly received more favorable pricing without justification." (Mot. to Dismiss Am. Compl. 14.) Although Citgo acknowledges Plaintiffs' identification of forty alleged Favored Distributors, it argues that Plaintiffs fail to "explain how these other marketers were similarly situated" to Plaintiffs. (*Id.*) Although it further acknowledges Stephenson and E&M's identification of at least one Favored Distributor who used the same terminal as them, Citgo argues that "[m]erely because two firms pick up gasoline at the same terminal does not mean that they are similarly situated" because the "retail outlets at which Stephenson sold its gasoline may not be anywhere near the locations of Modern Oil's retail outlets." (*Id.* 15.)

The Court finds that Stephenson has stated a claim for bad-faith pricing under § 2-305(2) by alleging that Citgo discriminated against it, *i.e.*, arbitrarily charged Stephenson a higher price than a similarly situated purchaser of Citgo gasoline. At a minimum, Stephenson has alleged that it is similarly situated to Modern Oil because (1) they both purchased Citgo gasoline from the same terminal; (2) they compete in the same regional market; and (3) there are no reasons, other than discriminatory or arbitrary reasons, that Stephenson should be charged more than Modern Oil for the gasoline. Similarly, the Court finds that E&M has stated a claim for bad-faith pricing under § 2-305(2) by alleging that Citgo discriminated against it, *i.e.*, arbitrarily charged E&M a higher price than a similarly situated purchaser of Citgo gasoline. At a minimum, E&M has alleged that it is similarly situated to Susser because (1) they both purchased Citgo gasoline from the same terminal; (2) they compete in the same regional market; and (3) there are no reasons, other than discriminatory

or arbitrary reasons, that E&M should be charged more than Susser for the gasoline.[11]   Such allegations are sufficient to support a finding that Plaintiffs were the victims of discriminatory, bad-faith pricing. *See Dixie Gas & Food, Inc. v. Shell Oil* Co., No. 03-C-8210, 2005 WL 1273273, at * 5 (N.D. Ill. May 25, 2005) (unpublished) (allegations that the defendant "unjustifiably provided preferred tank wagon pricing to company-owned and/or other preferred dealers" were "sufficient to state a claim that [the defendant] did not set an open price term . . . in good faith"); *ISP Mineral Prods., Inc. v. GS Roofing Prods. Co.*, No. CIV.A.3:97-CV-2326R, 1999 WL 102818, at * 3 (N.D. Tex. Feb. 22, 1999) (unpublished) (denying motion to dismiss where plaintiff alleged that, "while it was paying the published list price, [the defendant] was offering substantial discounts from that price to its other customers"). *Cf. Havird Oil Co., Inc.*, 149 F.3d at 290 (affirming district court's grant of summary judgment because, *inter alia*, the summary judgment evidence showed that the defendant "charged all its customers . . .  the same posted rack price").

The Court rejects Citgo's argument that Plaintiffs' claims must fail because they did not allege the location of specific retail outlets in relation to retail outlets of its alleged competitors. Plaintiffs' allegations that at least some Favored and Disfavored Distributors purchased Citgo gasoline from the same terminal and are in competition are sufficient for purposes of a motion to dismiss.  While factual details regarding the locations of various competing retail outlets may be

---

[11]   The Court makes no findings, for purposes of the Motions to Dismiss, as to whether Favored Distributors who did not purchase from the same terminal as Plaintiffs are considered "similarly situated" for purposes of the § 2-305 price-discrimination analysis.  However, Plaintiffs' response indicates that their theory of price discrimination applies only to those Favored and Disfavored Distributors who purchased from the same terminal.  (*See* Resp. to Mot. to Dismiss Am. Compl. 14 ("Stephenson Oil is not claiming the pricing between terminals is discriminatory.  Instead, Citgo discriminated on price within the purchasers' pricing zone, that is, the terminal.").)

relevant in later stages of the proceedings, such factual details need not be alleged in order to state a claim for relief. *See generally Bob's Shell, Inc.*, 2005 WL 2365324, at * 5 (denying summary judgment because, *inter alia*, the plaintiffs had presented "genuine issues of material fact" regarding whether competitors receiving the benefits of price discrimination were "similarly situated" and because the plaintiffs "ought not to be precluded from demonstrating at trial that the comparisons they wish to draw are apt").

The Court also rejects Citgo's reliance on cases holding that an allegedly discriminatory price or pricing scheme did not violate § 2-305(2) as a matter of law. For example, in *United Food Mart v. Motiva Enterprises, Incorporated*, 457 F. Supp. 2d 1329, 1331 (S.D. Fla. 2005), the plaintiffs' contracts required them to pay the "price in effect at the time loading commences . . . for the place of delivery." The "price in effect" that plaintiffs were charged was the DTW price. According to testimony of the defendant's retail sales manager, the defendant set its DTW prices according to a "zone" system, whereby retailers were charged different DTW prices depending on their respective competitive zones. The plaintiffs alleged, *inter alia*, that this pricing scheme was discriminatory and in violation of Florida's version of § 2-305. As to whether the DTW price was set in a discriminatory manner, the court granted summary judgment in favor of the defendant. The Court reasoned: (1) the defendant "designed its zone area pricing system with the assistance of a third-party consultant, who considered legitimate business factors such as traffic flow, population distribution, market conditions, etc."; (2) the plaintiffs presented no evidence that the defendant developed its zone area pricing system for discriminatory reasons or that the defendant used its system in an arbitrary or capricious manner; (3) the DTW price was applied uniformly among the dealers in the plaintiffs' zone; and (4) it was a "normal case" where one station owner believed its

16

wholesale price was too high compared to the prices charged to nearby station owners. *Id.* at 1335-38; *see also, e.g., Yonaty v. Amerada Hess Corp.*, No. 304CV605, 2005 WL 1460411, at * 4-7 (N.D.N.Y. June 20, 2005) (unpublished) (plaintiff alleged that uniformly applied DTW price, which was set based on zoning method, violated New York's version of § 2-305) (granting summary judgment to defendant where the Court "had no means of assessing the propriety of the defendant's pricing policies" because the plaintiff presented no evidence of (1) DTW prices of other franchisors in the plaintiff's area, (2) the retail prices at other stations in the plaintiff's area, (3) the defendant's profit margins, or (4) the relative percentage that the DTW prices constituted of the plaintiff's expenses).

These cases are distinguishable because the courts considered an evidentiary record, which generally included testimony from industry experts, in determining whether a pricing scheme was discriminatory.[12]  Thus, even assuming Citgo's cited cases are factually applicable, they do not support a Rule 12(b)(6) dismissal.  Second, the Court is not convinced that Citgo's cited cases are factually applicable to the alleged discriminatory pricing scheme presented here.  All of Citgo's cited cases involved allegations that "DTW" zone pricing at the retail level was discriminatory because defendants charged different prices to retailers in different zones.  Here, Plaintiffs' allegations do not involve DTW pricing at the retail level; they involve rack pricing at the terminal.  By alleging discriminatory pricing among wholesale purchasers at the same terminal, Plaintiffs are potentially alleging the equivalent of discrimination among retail purchasers within the same "price zone," rather than discrimination between different pricing zones.  Further, differences between the

---

[12]  Citgo did not cite any cases granting a Rule 12(b)(6) motion.

17

level of distribution in this case and the level of distribution in Citgo's cited cases will likely impact the Court's "similarly situated" analysis.  Plaintiffs contend:

> Citgo distributors picking up gasoline from a given terminal are similarly situated because they deliver into the same geographic area and compete for the same business of independent Citgo distributors in that area.  These distributors look the same to Citgo because the cost of supplying them is the same – that is, because the distributors have their own trucks, Citgo's work is done the moment a truck pulls out of its terminal after loading.  By contrast, gasoline stations, like those in the case cases cited by Citgo, compete within much smaller geographic areas and are fixed in place.  Thus, the determination of whether they are similarly situated depends on factors including the roads on which they sit, the costs to supply them and their proximity of other stations.

(Resp. to Mot. to Dismiss Am. Compl. 14.)  While the Court is without a sufficient record to judge the factual accuracy of this argument, the Court is persuaded that Citgo's cited cases are not so factually similar to the case presented as to mandate dismissal.  Instead, Plaintiffs' allegations may require an entirely different "similarly situated" analysis to that applied in Citgo's cited cases.

### 2.    *Commercial Unreasonableness*

In order for a "posted price" to be protected by the safe harbor, a defendant must observe "reasonable commercial standards of fair dealing in the trade" in setting such price.  *See* Okla. Stat. tit. 12A, § 2-305 cmt. 3 ("Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant.").  There is no precise definition of commercial reasonableness, and "the facts of each case are determinative of whether conduct is commercially reasonable." *Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1323.  "Departures from customer usages and commercial practices, flushed out through expert testimony, strongly indicate that the merchant's conduct is unreasonable." *Id.*

As interpreted by this Court, case law allows for at least two ways in which a defendant can fail to observe "reasonable commercial standards of fair dealing in the trade."  First, a defendant can

set a commercially unreasonable price, *i.e.*, one that is not reasonable based on market conditions and prices being charged by other competitors. *See Havird Oil Co., Inc.*, 149 F.3d at 291 (considering whether the defendant's price was "competitive with other wholesalers in the North Augusta area"); *United Food Mart*, 457 F. Supp. 2d at 1335 (considering whether "DTW price fell within the range of prices that other suppliers in the relevant geographic market charged"); *Cain v. Chevron U.S.A., Inc.*, 757 F. Supp. 1120, 1124 (D. Or. 1991) (considering whether "zone" price charged to the plaintiff "compared favorably to other zone pricing systems in the industry"); *Shell Oil Co.*, 144 S.W.2d at 437 (considering whether the defendant's posted price, which was more than most others in the Houston area, was nonetheless "commercially reasonable"). Second, a defendant can utilize a commercially unreasonable method or trade practice in setting the price charged to a plaintiff. *See Havird Oil Co., Inc.*, 149 F.3d at 291 (considering whether the defendant's method of setting its rack price followed "reasonable commercial standards of fair dealing in the trade"); *Cain,* 757 F. Supp. at 1124 (considering whether the defendant's "zone pricing system" was a "commercially reasonable trade practice").[13]

The first type of unreasonableness – unreasonableness of the price itself – is not alleged. Plaintiffs admit that Citgo charged them the rack price, that such price was set in conformity with industry standards, and that such price was comparable to that charged by Citgo's competitors. (*See* Am. Compl. ¶¶ 19-20.) The second type of unreasonableness is at issue. Plaintiffs' theory is that, by secretly charging Distributors different prices and allowing Favored Distributors to use "formula

---

[13] Citgo appears to contend that the only consideration in determining "commercial reasonableness" is whether the ultimate price charged to the plaintiff is a reasonable price. However, this ignores the plain language of § 2-305(2), which requires observance of "reasonable commercial standards of fair dealing" and not just an ultimately fair price.

pricing" rather than the rack price, Citgo acted "in a commercially unreasonable way."  (Resp. to Mot. to Dismiss Am. Compl. 16.)

For the same or similar reasons that Plaintiffs' allegations state a claim for discriminatory pricing, Plaintiffs' allegations sufficiently allege a "commercially unreasonable" method of setting the MFA Open Price Term.  According to Plaintiffs, it is the industry "standard" for sellers to "offer the wholesale price at each terminal on a non-discriminatory basis, *i.e.*, each distributor purchasing the same gasoline product on the same date at the same terminal would be charged the same price." (Am. Compl. ¶ 21.)  Plaintiffs will attempt to prove, by expert or other evidence, that Citgo's practice of (1) dividing Distributors into two categories, (2) giving Favored Distributors a lower price than the rack price charged to Disfavored Distributors, and (3) keeping the lower price secret from the Disfavored Distributors results in a failure to observe reasonable commercial standards of fair dealing in the gasoline industry.  Whether or not this is actually a "commercially unreasonable" practice in the industry remains to be seen.  However, Plaintiffs have alleged that this is an unreasonable practice, and Citgo has not provided the Court with any authority holding that, as a matter of law, its alleged method of setting prices is commercially reasonable or standard in the industry as means of maximizing profits.  *See, e.g., Cain*, 757 F. Supp. at 1124-25 (holding that Chevron's "zone pricing" policy, whereby dealers in high-competition markets were charged less than dealers in low-competition markets, did not violate Oregon's equivalent of § 2-305 because, *inter alia*, zone pricing is "commonplace in the petroleum business" and "constitutes a commercially reasonable trade practice").  Instead, Citgo merely argued that the *price* ultimately charged to Plaintiffs was commercially reasonable, which misses the thrust of Plaintiffs' alleged theory of commercial unreasonableness.

3.      *Subjective Bad Faith*

Plaintiffs have stated a claim for bad-faith pricing under § 2-305(2) because they have sufficiently alleged price discrimination and commercial unreasonableness.  At this stage of the proceedings, the Court need not delve into the debate explained in Part III and determine whether subjective, bad-faith intentions, standing alone, are sufficient to support a § 2-305(2) claim.[14] However, Plaintiffs have alleged that, in charging different prices to different Distributors, Citgo's subjective intent was to "maximize profits [by] . . . increas[ing] its sales volumes without lowering its publicly posted rack price," thereby "avoid[ing] the potential of competitive conduct by other oil companies who might lower their rack prices to meet a reduction in Citgo's posted rack price." (Am. Compl. ¶ 24.)  Plaintiffs further alleged that this pricing scheme was implemented in "reckless disregard for the economic survival of the Disfavored Distributors," (*id.* ¶ 37), and that such scheme furthered Citgo's new business strategy, pursuant to which its distributors had become "expendable," (*id.* ¶¶ 38-47).[15]  Without deciding whether they would be sufficient on their own, the Court finds that these allegations at least support Plaintiffs' overall claim for discriminatory, commercially unreasonable pricing under § 2-305.  *See generally Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1324-25 (denying motion for summary judgment and finding that the defendant potentially

---

[14]  The Court will revisit this legal question if necessary at later stages of the proceedings.

[15]  Plaintiffs do not expressly allege, as has been alleged in certain other cases, that Citgo acted with the intent to drive them out of business.  *See, e.g., Mathis*, 302 F.3d at 458 (affirming jury verdict in favor of the plaintiffs where jury accepted plaintiffs' assertion that defendant "intended to drive the franchisees out of business"); *Bob's Shell, Inc.*, 2005 WL 2365324, at * 6 (denying motion for summary judgment where the plaintiffs' evidence "could demonstrate to a jury that the defendant "made it impossible for [p]laintiffs to survive and that it set prices in an attempt to drive them out of business").  Instead, Plaintiffs allege that Citgo acted with the intent to maximize its profits, while showing reckless disregard for whether it would drive Plaintiffs out of business.

acted with subjective bad faith by implementing a scheme whereby the defendant acted in bad faith by secretly dividing its dealers into "keepers" and "non-keepers," while internally recognizing that its pricing practices were driving the "non-keepers" out of business).

B.      Is Plaintiffs' Claim Barred by UCC Notice Requirements?

Citgo next argues that Plaintiffs "failed to provide the requisite notice to Citgo of the alleged breaches, as required by §§ 2-714 and 2-607 of the Oklahoma Commercial Code." (Mot. to Dismiss Am. Compl. 20.) Section 2-714 provides:

> Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Okla. Stat., tit. 12A, § 2-714(1). Section 2-607, referenced in § 2-714(1), provides in relevant part:

> (3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .

*Id.* § 2-607(3)(a); *see also Davis v. Pumpco, Inc.*, 519 P.2d 557, 560 (Okla. Civ. App. 1974) ("The Oklahoma Supreme Court has held that consequential damages may not be recovered for an innocent mistake of the seller where the buyer discovers a defect in ample time and with an easy opportunity to avoid the injury, yet fails to notify the seller."). Citgo contends that Plaintiffs' claims fail because Plaintiffs failed to allege that they "gave any notice prior to bringing suit." (Mot. to Dismiss Am. Compl. 21.)[16]

---

[16] Citgo does not make any factual arguments regarding the timing of the filing of the lawsuit, *i.e.*, that an unreasonable amount of time elapsed between the breach and the filing of the lawsuit. Instead, Citgo urges the Court to adopt a *per se* rule that pre-suit notice is required and that filing of a lawsuit can never meet the relevant UCC notice requirements.

Plaintiffs admit that they did not provide Citgo with pre-suit notice of its claim for breach

of contract.  Plaintiffs argue, however, that their claim is not precluded because: (1) § 2-714 has no

application to "non-conformity" related to price, which is alleged in this case; and (2) even if  § 2-

714 does apply, filing of the lawsuit provided requisite notice for purposes of §§ 2-714(1) and 2-

607(3)(a).  Neither of these questions  appears to have been addressed in Oklahoma or Tenth Circuit

case law.  For purposes of this motion only, the Court assumes, without deciding, that § 2-714 has

application to a "nonconformity" related to price.[17]  However, for reasons explained below, the

Court refuses to adopt a *per se* rule that pre-suit notice is required in every case and therefore rejects

Citgo's argument in support of dismissal.

Comment 4 to § 2-607 provides:

> The time of notification is to be determined by applying commercial standards to a merchant buyer. "A reasonable time" for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

Okla. Stat., tit. 12A, § 2-607, cmt. 4.  Generally, the notice requirement in § 2-607(3) serves two

purposes:  (1) to open "the way for settlement through negotiation between the parties"; and (2) to

minimize "the possibility of prejudice to the seller by giving it ample opportunity to cure the defect,

inspect the goods, investigate the claim, or do whatever may be necessary to properly defend himself

or minimize his damages while the facts are fresh in the minds of the parties." *Std. Alliance Indus.,*

---

[17]   In the only case cited by the parties addressing this question, which is unpublished, the court held that "a breach of a contractual price term can qualify as a non-conformity under section 2-714" and that such a claim was subject to §§ 2-714 and 2-607(3)'s notice requirements. *Dixie Gas & Food, Inc.*, 2005 WL 1273273, at * 6.  However, the court explained that § 2-714 non-conformity "is typically associated with breaches of warranty or other claims arising from a physical non-conformity of the goods received as opposed to a 'non-conformity' related to price" and noted the lack of any direct authority on this issue.  *See id.*

*Inc. v. Black Clawson Co.*, 587 F.3d 813, 826 (6th Cir. 1978); *see also Am. Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592, 596 (Okla. 1981) (stating that the general purpose of UCC notice requirement is to enable the seller to minimize damages in some manner and to give the seller some immunity from stale claims).  In consideration of these purposes,  the weight of case law holds that filing a lawsuit can, under certain circumstances, constitute sufficient notice.  *See In re Bridgestone/Firestone, Inc. Tires Products Liability Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001) (listing cases holding that "the filing of a lawsuit can, in some instances, satisfy the notice of breach requirement").  *But see Dixie Gas & Food, Inc.*, 2005 WL 1273273, at * 6 (applying Illinois law and holding that filing of lawsuit did not constitute sufficient notice under §§ 2-714 and 2-607(3) in a case involving a bad-faith pricing scheme) ("Plaintiffs apparently accepted all dealer tank wagon deliveries and do not allege that they ever provided notice to Shell of its alleged dealer tank wagon pricing breaches.  Filing this lawsuit did not serve as proper notice.").

The Court predicts that Oklahoma courts would hold that § 2-607(3) does not, in all circumstances, require pre-suit notice.  In so holding, the Court agrees with and adopts the reasoning set forth by the Southern District of Indiana in *In re Bridgestone/Firestone*:

> [T]he plain language of the statute does not require that notice be given prior to filing suit, only that notice be given within a reasonable time. Neither are the main policies behind the notice of breach requirement - protecting defendants from stale claims, "open[ing] the way for normal settlement through negotiation" (Comment 4 to U.C.C. § 2-607), and giving the defendant the opportunity to correct any defect - necessarily frustrated if notice is given by filing suit. Obviously, the first policy is promoted equally whether early notice is given by informal letter or the filing of a lawsuit. As to the policy of promoting settlement, we do not believe that filing suit is an impediment to successful settlement negotiations. "To the contrary, the prospect of going to trial is often a powerful incentive to a defendant to investigate the claims against it and to arrive at a reasonable agreement."  Finally, in cases such as this one (assuming, as we must, that the facts as pled are true), where Defendants had ample notice of the defect in the products well before the lawsuit was filed, and, indeed, allegedly well before Plaintiffs themselves did, and chose not to remedy those

24

defects, no purpose would be served by requiring pre-litigation notice. Therefore, we conclude that a per se rule that the filing of a lawsuit can never satisfy the notice of breach requirement would be improper . . . . Whether § 2-607(3)(a) was satisfied in this case involves the resolution of questions of fact; however, it is clear that there are facts . . . that, if ultimately proven, will support a finding that the Plaintiffs provided the requisite notice of breach to the Defendants by filing suit.

*Id.* (holding that the plaintiffs' claims "will not be dismissed on the basis that they did not satisfy

§ 2-607(3)(a)") (internal citations omitted). Accordingly, the Court rejects Citgo's asserted basis

for dismissal, rejects any contrary reasoning in *Dixie Gas & Food, Inc.*, and will allow Plaintiffs'

claim to proceed despite the absence of pre-suit notice.[18]

### C.    Is Plaintiffs' Claim Barred by Voluntary Payment Doctrine?

Pursuant to the voluntary payment doctrine, "[m]oney voluntarily paid under a claim of right

to payment, *with full knowledge of all of the facts which would entitle the payor to relief* against the

payment of the claim, cannot be recovered on the ground that the claim was illegal." *Hadley v.*

*Farmers Nat'l Bank of Okla. City*, 257 P. 1101, 1103-04 (Okla. 1927) (emphasis added). This

doctrine is an affirmative defense. *McWethy v. Telecomm., Inc.*, 988 P.2d 356, 357 (Okla. Civ. App.

1999). In order for a defendant to be entitled to dismissal based on this doctrine, a plaintiff must

allege "full knowledge of all facts" in its complaint. *See id.* at 357-58 (affirming dismissal based

on voluntary payment doctrine where the plaintiff admitted in his petition that (1) the defendants

sent him monthly billing statements that specified a due date for payment of services, (2) he knew

---

[18]    To the extent Plaintiffs urge the Court to find that the notice provided by filing the lawsuit was sufficient as a matter of law (*see* Resp. to Mot. to Dismiss Am. Compl. 19), the Court declines to do so at this stage of the proceedings. The question of the reasonableness of notice turns on the facts and circumstances of each case and is better suited for later stages of the proceedings. *See Am. Fertilizer Specialists, Inc.*, 635 P.2d at 596-97.

a $3.00 late fee would be assessed if payments were not made by the due date, and (3) he had paid the late charge during the course of his service contract with the defendants).

In this case, Plaintiffs allege that Citgo implemented the bad-faith pricing scheme "secretly and selectively" for Favored Distributors while "maintaining the publicly posted rack prices for sales" to Plaintiffs and other Disfavored Distributors.  (Am. Compl. ¶ 25.)  Plaintiffs have not alleged "full knowledge" of the facts that would entitle them to relief; instead, Plaintiffs allege that they were unaware of the bad-faith pricing scheme at the time they paid the rack prices.  Therefore, the voluntary payment doctrine does not require dismissal.

## V.  Conclusion

Defendant Citgo Petroleum Corporation's Motion to Dismiss Amended Complaint of Stephenson Oil Company (Doc. 38) and Defendant Citgo Petroleum Corporation's Motion to Dismiss the Complaint of E&M Oil Company, Inc.  (Doc. 89) are DENIED.

**IT IS SO ORDERED** this 2nd day of October, 2009.

_____
**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

26