IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

STEPHENSON OIL COMPANY,                )
on behalf of itself and all others similarly   )
situated,                                       )
                                               )
                Plaintiff,                      )
vs.                                            )        Case No.  08-CV-380-TCK-TLW
                                               )
                                               )
CITGO PETROLEUM CORPORATION,   )
                                               )
                Defendant.                      )

<u>OPINION AND ORDER[1]</u>

        Before the Court is Plaintiff's Motion for Class Certification ("Motion for Certification")

(Doc. 152), made pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"); Defendant's Motion

to Strike Declaration of Alvin Smith (Doc. 199); Defendant's Motion to Strike Testimony of

Plaintiff's Proposed Expert Regarding Injury (Doc. 215); and Defendant's Motion to Make its Class

Certification Exhibits Part of the Record (Doc. 217).

I.      **Factual Background**

        On June 30, 2008, Plaintiff Stephenson Oil Company ("Stephenson") filed a class-action

Complaint on behalf of itself and others similarly situated against Defendant Citgo Petroleum

Corporation ("Citgo") and subsequently filed an Amended Complaint on September 22, 2008.  The

Amended Complaint asserts a single cause of action for breach of contract.  Citgo moved to dismiss

the Amended Complaint ("Motion to Dismiss") pursuant to Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)") and moved to stay all deadlines pending the Court's ruling on the Motion to

Dismiss. The Court denied Citgo's motion to stay and rejected Citgo's alternative proposal to limit

_____

        [1] This Opinion and Order is a redacted version of the Court's official Opinion and Order
(Doc. 265), which will remain under seal.

discovery to class-certification issues.  (*See* Doc. 53.)  The parties proceeded to conduct discovery

on all issues.

On October 2, 2009, the Court entered an Opinion and Order denying the Motion to Dismiss.

(*See* Doc. 149.)[2]  The 12(b)(6) Order, which sets forth the factual allegations in the Amended

Complaint, is incorporated herein by reference.[3]  In the 12(b)(6) Order, the Court discussed the

theory underlying Stephenson's breach of contract claim:

> In the Amended Complaint, Plaintiff asserts a single cause of action for breach of
> contract.  Plaintiff contends that Citgo's pricing practices breached the MFAs
> because such practices "violate reasonable commercial standards of fair dealing" in
> the gasoline trade and because Citgo's "pricing was committed in bad faith." (Am.
> Compl. ¶¶ 36-37.) Although there is no express provision of the MFAs requiring
> compliance with reasonable commercial standards or requiring good faith, the
> Uniform Commercial Code ("UCC"), as adopted in Oklahoma, requires a seller to
> exercise good faith in setting an open-price term. *See* Okla. Stat. tit. 12A, § 2-305(2)
> ("A price to be fixed by the seller or by the buyer means a price for him to fix in
> good faith."); *see also infra* Part III. In its response to the Motions to Dismiss,
> Plaintiff makes clear that its breach of contract claim is based on Citgo's failure to
> set the MFA Open Price Term in good faith, as required by § 2-305(2). (*See* Resp.
> to Mot. to Dismiss Am. Compl. 10-17.)

(12(b)(6) Order 5-6.)

The Court proceeded to analyze, in accordance with the parties' briefs, whether Stephenson

stated a claim for breach of contract based on a theory of bad-faith pricing prohibited by title 12A,

---

[2]  On July 28, 2010, immediately prior to entry of this Opinion and Order on class
certification, the Court entered an Amended Opinion and Order on the Motion to Dismiss.  (Doc.
264.)  The Amended Opinion and Order omits discussion of Defendant's Motion to Dismiss
E&M Oil Company, Inc.'s Complaint (Doc. 89).  The Court's discussion of E&M Oil Company,
Inc. ("E&M") was in error because E&M had previously dismissed its claim (*see* Doc. 115),
rendering moot Citgo's motion to dismiss E&M's Complaint.  The Amended Opinion and Order
makes no substantive changes in the Court's original ruling and reasoning.  The Amended
Opinion and Order (Doc. 264) is hereinafter referred to as the "12(b)(6) Order."

[3]  Unless otherwise identified, the short names used herein are those used in the 12(b)(6)
Order.

section 2-305(2) of the Oklahoma Uniform Commercial Code ("§ 2-305(2)").  The Court held that

Stephenson had alleged facts sufficient to state a claim for relief by alleging (1) price discrimination

between it and at least one allegedly similarly situated Favored Distributor, and (2) commercial

unreasonableness in Citgo's method of setting of the MFA Open Price Term applicable to

Stephenson.  With respect to price discrimination, the Court: (1) rejected Citgo's argument that §

2-305(2) does not prohibit price discrimination (*see* 12(b)(6) Order at Part III); and (2) held that

Stephenson had alleged facts sufficient to show that it was "similarly situated" to a competitor

named Modern Oil Co. ("Modern Oil") that allegedly purchased from the same terminal as Citgo

during relevant times (*see id.* 13-17).  With respect to commercial unreasonableness, the Court

determined that utilization of a "commercially unreasonable method or trade practice in setting the

price" can potentially violate reasonable commercial standards of fair dealing in the trade, even if

the price charged is the rack price.  (*Id.* 17-18.)  The Court held:

> According to Plaintiff, it is the industry "standard" for sellers to "offer the wholesale
> price at each terminal on a non-discriminatory basis, *i.e.*, each distributor purchasing
> the same gasoline product on the same date at the same terminal would be charged
> the same price." (Am. Compl. ¶ 21.)  Plaintiff will attempt to prove, by expert or
> other evidence, that Citgo's practice of (1) dividing Distributors into two categories,
> (2) giving Favored Distributors a lower price than the rack price charged to
> Disfavored Distributors, and (3) keeping the lower price secret from the Disfavored
> Distributors results in a failure to observe reasonable commercial standards of fair
> dealing in the gasoline industry. Whether or not this is actually a "commercially
> unreasonable" practice in the industry remains to be seen.

(*Id.* 18-19.)

The Court discussed the debate regarding whether a defendant's subjective, bad-faith

intentions are sufficient, standing alone, to violate § 2-305(2).  (*See* 12(b)(6) Order at Part III.)

Because the Court allowed Plaintiff's breach of contract claim to proceed under § 2-305(2)'s more

widely accepted price discrimination and commercial unreasonableness theories, the Court did not

3

reach the question of whether allegations of bad-faith motives, standing alone, would have been sufficient to survive a motion to dismiss.  (*Id.* 19-20.)[4]  As to Citgo's asserted defenses, the Court held: (1) Stephenson's claim was not barred by UCC notice requirements; and (2) Stephenson's claim was not subject to dismissal based on the "voluntary payment doctrine" because Stephenson alleged to be unaware of the alleged discriminatory and/or commercially unreasonable pricing scheme at the time it paid the rack price.  (*Id.* 20-25.)

On October 9, 2009, Stephenson filed the Motion for Certification currently pending, attaching the Declaration of Alvin Smith ("Smith") ("Smith Declaration"), its proposed industry expert,[5] and volumes of other exhibits.  Stephenson seeks to certify the following class:

> All Disfavored Distributors of gasoline supplied by CITGO who signed the Citgo Contract, in the fifty United States, and who purchased gasoline from Citgo from July 1, 2004 to the present.  Excluded from the class are (a) CITGO, its employees, officers and directors, and their immediate family members, (b) the Favored Distributors, their employees, officers, and directors, and their immediate family members, and (c) any governmental entity.

(Pl.'s Mot. for Class Certification 2.)  Citgo filed a response to the Motion for Certification, also attaching volumes of exhibits in support of its objection.

---

[4]  At this juncture in the proceedings, Stephenson has clearly abandoned any theory based exclusively on Citgo's bad-faith motives.  (*See* Class Cert. Hr'g Tr. 14-19 (counsel explaining three theories pursuant to which it moves to certify a class and not including subjective bad faith as stand-alone theory supporting class certification).)

[5]  On February 9, 2010, Citgo filed a motion to strike the Smith Declaration, arguing that Smith is not qualified to opine on industry standards.  This motion is denied as premature.  *See* David F. Herr, *Manual for Complex Litig.* § 21.21, at 267-68 (4th ed. 2004) ("The judge need not decide at the certification stage whether [] expert testimony satisfies standards of admissibility at trial.").

4

On February 25, 2010, the Court conducted a hearing on the Motion for Certification, during which the parties made arguments, presented certain exhibits,[6] and presented live witnesses. Stephenson presented live testimony of economist Barry Mukamel ("Mukamel"), and Citgo presented live testimony of economist Joseph Kalt ("Kalt"). Following the testimony of Mukamel, the Court requested a summary exhibit of certain portions of his testimony. In accordance with the Court's request, on March 2, 2010, Stephenson submitted a Notice of Submission of Additional Exhibits Relevant to Class Certification, attaching Plaintiff's Exhibits 98 and 103. (*See* Doc. 204.)

On March 29, 2010, Citgo filed its Motion to Strike Testimony of Plaintiff's Proposed Expert Regarding Injury (Doc. 215), including Mukamel's testimony related to Exhibits 98 and 103, arguing that such testimony was untimely and factually unsupported.[7] On June 7, 2010, upon the joint motion of the parties, the Court entered an Amended Scheduling Order extending the discovery deadline until November 30, 2010, extending the expert identification and reports deadline until November 1, 2010, extending the dispositive motion deadline until December 14, 2010, and setting a trial date of April 18, 2011.

---

[6] Citgo brought dozens of boxes of exhibits to the hearing, most of which were not discussed or presented at the hearing. Following the hearing, Citgo filed a Motion to Make its Class Certification Exhibits Part of the Record (Doc. 217). Stephenson objected, arguing that this "attempted supplemental filing consists of literally millions of pages of documents, which are not tied to any briefing or argument to identify which documents are even relevant or what issues they correspond to." (Resp. to Mot. to Supp. 1-2.) The Court agrees with Stephenson and finds no reason to supplement the hearing record with voluminous exhibits that were neither admitted nor referred to at the hearing. However, the Court ordered Stephenson to supplement the record with certain class-certification hearing exhibits to which Citgo specifically referred in subsequent briefing that were not otherwise part of the record (*see* Doc. 245), and Citgo has done so, (*see* Doc. 247).

[7] As explained *infra* note 13, the briefs on this motion included significant discussion of Stephenson's standing. Such briefs are therefore extensively referred to throughout this Opinion and Order.

II.     **Timeliness of Stephenson's Theories**

Before addressing the merits of the Motion for Certification, the Court must decide initial matters raised by the briefing: (1) whether Stephenson has timely asserted a "straight" breach of contract theory ("straight breach theory") that is divorced from the good-faith requirement in § 2-305(2); and (2) whether Stephenson has timely asserted an availability theory of injury and damages ("availability theory"), which is explained in more detail below.

A.      Straight Breach Theory

At the Rule 12(b)(6) stage, Citgo challenged Stephenson's entire theory of its breach of contract claim.  Specifically, Citgo challenged whether§ 2-305(2) functions to prevent price discrimination in the setting of an open-price term.  In addition, Citgo argued that Stephenson's breach of contract claim must be dismissed because Stephenson failed to allege any facts that would constitute an actual violation of § 2-305(2).  In objecting to the Motion to Dismiss, Stephenson argued that the Amended Complaint stated a claim for breach of contract because: (1) Citgo committed price discrimination in setting the MFA Open Price Term, as prohibited by § 2-305(2); and (2) Citgo acted unreasonably and in violation of commercial standards in setting the MFA Open Price Term, as also prohibited by § 2-305(2).  (*See* Pl.'s Resp. to Def.'s Mot. to Dismiss 11-17.)  The parties' arguments were couched entirely in terms of § 2-305(2).  The Court's 12(b)(6) Order was also couched entirely in terms of § 2-305(2), and the Court even stated that "Plaintiff makes clear that its breach of contract claim is based on Citgo's failure to set the MFA Open Price Term in good faith, as required by § 2-305(2)."  (12(b)(6) Order 6.)  In making this observation, the Court endeavored to clarify that Stephenson's *exclusive* theory of contract recovery was tied to § 2-305(2) and was not based on breach of the contractual language itself.  Until the briefing on the Motion for

6

Certification, the parties and the Court were proceeding exclusively under a § 2-305(2) theory of breach.[8]

In Stephenson's reply brief in support of its Motion for Certification, it first set forth a different breach of contract theory – that Citgo's conduct constitutes a breach *of the language* of the MFA Open Price Term, rather than merely a breach of a § 2-305(2) good-faith duty that attaches to every open-price term.  (*See* Pl.'s Reply in Support of Mot. for Certification 6 ("By charging different distributors different prices, Citgo breached the Citgo Contracts - period.  No individual 'good faith' inquiries are necessary.").)  At the class-certification hearing, counsel for Stephenson presented the straight breach theory as a third permissible theory under which to certify a class.  (*See* Class Cert. Hr'g Tr. 18-19 ("[O]ur third theory is the straight breach of contract of the plain language of the contract that Citgo entered into with its marketers . . . . The claim is set forth in our amended complaint and it is also set forth in our briefing on the motion for class certification.").[9] Citgo argues that this third theory is not reasonably contained in the Amended Complaint, is untimely, and should be disregarded for purposes of the Motion for Certification.

The Court has thoroughly reviewed the Amended Complaint and finds that the straight breach of contract theory is not reasonably encompassed therein.  The "breach of contract" allegations provide:

_____

[8]  Without speculating as to Stephenson's strategic decisions, it is certainly reasonable that it premised its breach of contract claim on the good-faith duty set forth in § 2-305(2) and not on a breach of the contractual language.  The MFA Open Price Term requires Citgo to provide Stephenson with the "marketer price," or the rack price, and Stephenson indeed received the rack price.  The allegation in the Amended Complaint is that, although Stephenson received the rack price as promised in the contract, the rack price was a bad-faith price prohibited by § 2-305(2).

[9]  The first two theories identified at the hearing were those Stephenson has asserted all along – price discrimination and commercial unreasonableness under § 2-305(2).

61. Plaintiff and each member of the Class entered into the CITGO Contract as set forth above. Under the terms of the CITGO Contract, Plaintiff and members of the Class were to purchase, and CITGO was to supply, CITGO gasoline for resale.

62. The *implied covenant of good faith and fair dealing* is applicable to and implicit in the CITGO Contract.

63. The CITGO Contract contains an open price term which provided that CITGO would sell gasoline to each distributor who signed it at distributor prices in effect at the time of delivery. Plaintiff, the members of the Class, and the Favored Distributors all signed versions of the CITGO Contract that contain open price terms that were the same in all material respects.

64. In fact, CITGO did not supply gasoline to Plaintiff and members of the Class at the same distributor prices that it provided to the Favored Distributors and as required under the terms of the CITGO Contract. *Instead, CITGO discriminated against members of the Class and created a disparity among the pricing offered to various distributors by providing lower net prices to the Favored Distributors at each terminal from which they obtained gasoline from CITGO.*

65. The failure of CITGO to provide Plaintiff and members of the Class with the same pricing it was providing to the Favored Distributors at each terminal utilized by both Favored and Disfavored Distributors *violated the requirement of good faith and fair dealing applicable to the CITGO Contract* **and otherwise constituted a breach of the CITGO Contract**.

66. The Uniform Commercial Code's *open price term provision is codified in Oklahoma law at 12A Okl. St. Ann § 2-305.* As noted above, the CITGO Contract, drafted by CITGO, mandates that it be interpreted and applied under Oklahoma law.

67. One concern of the UCC Drafting Committee *in adopting § 2-305(2) was to prevent discriminatory pricing;* that is, to prevent suppliers from charging two buyers with identical open pricing provisions in their respective contracts different prices, or arbitrary or discriminatory prices.

68. U.C.C. § 2-305 requires a seller to set an open price term in good faith. Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

69. Plaintiff and the members of the Class were similarly situated with those Favored Distributors purchasing CITGO's gasoline from the same terminal on the same date.

70. CITGO breached the CITGO Contract with Plaintiff and members of the Class by failing to provide them with the same net pricing for gasoline that was enjoyed by the Favored Distributors at each of CITGO's terminals. *As explained above, CITGO failed to act in good faith, because through its pricing practices CITGO, (A) failed to act honestly in fact, and (B) failed to abide by commercially reasonable standards in the industry.*

(Am. Compl. ¶¶ 61-70 (emphases added).)  The only possible "straight breach" allegation is the bolded, underlined language above.  (*See id.* at ¶ 65 ("and otherwise constituted a breach of

contract").)  However, all factual and legal averments surrounding the bolded statement, which the Court has italicized, indicate that a violation of § 2-305(2) gives rise to the breach.  Stephenson failed to provide any explanation or other factual details regarding how charging Stephenson the promised rack price "otherwise constituted a breach."  Instead, the only allegations are that Citgo engaged in prohibited price discrimination and commercially unreasonable conduct in setting the open-price term.  Further, even at this point in the proceedings, Stephenson has not identified any specific language in the Amended Complaint supporting the straight breach theory or sufficiently explained how the straight breach theory was encompassed therein.  Read as a whole and in light of the very specific allegations tied to § 2-305(2), the Amended Complaint cannot be reasonably construed to include the straight breach theory.  Instead, Citgo and this Court were given "every signal" that this case involved only a § 2-305(2)-based breach.  *See Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) ("Aside from ¶ 20, every signal in the amended complaint informed [the defendant] that [the plaintiff] was not raising a wage claim under the Fair Labor Standards Act (FLSA) or some state law.").

In addition, the Court will not construe the Amended Complaint as encompassing a straight breach theory or allow Stephenson to amend at this stage because Citgo would be severely prejudiced.  In *Zokari*, the Tenth Circuit recently explained:

> As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.  *We do not believe, however, that the liberalized pleading rules permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case. This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.*  Expressing that holding in terms of Rule 8(e), one would say that

> it would not have served justice at that stage of the proceedings to construe the plaintiff's complaint as encompassing a failure-to-hire claim. . . . It must be remembered that an undue amount of permissiveness toward the pleadings by the judicial system eventually may be reflected as an unwarranted increase in the burden on the other parties and the district judge.

*Zokari*, 561 F.3d at 1087 (internal citations and quotations omitted) (emphasis added).

In this case, two main factors counsel against allowing Stephenson to proceed with a straight breach theory for purposes of class certification. First, Citgo tested the Amended Complaint by filing a motion to dismiss couched in terms of § 2-305(2). Stephenson did not argue that, even if its § 2-305(2) theory failed, its straight breach theory should save the day. Thus, neither Citgo nor the Court were placed on any reasonable notice that breach of the contractual language itself was an underlying theory of Stephenson's claim. This is true despite significant briefing regarding the novelty of Stephenson's theory of recovery. In other words, Stephenson had every incentive to thoroughly explain and present all theories of its breach of contract claim in order to avoid dismissal of its lawsuit and yet failed to raise the straight breach theory at that time.

Second, over Citgo's strenuous objection, the Court allowed Stephenson to proceed with discovery on all issues, including the merits and class certification. Therefore, for purposes of all discovery related to class certification and Citgo's brief in opposition to class certification, Citgo was not reasonably apprised of the straight breach theory. Such theory came as a surprise to the Court in Stephenson's reply brief in support of its Motion for Certification, and the Court does not question that it came as a surprise to Citgo. This surprise was prejudicial to Citgo because Citgo has been attempting to defeat class certification with the assumption of two class-wide theories of relief – price discrimination and commercially unreasonable conduct prohibited by § 2-305(2). In some cases, a change in theories of contract recovery would make little difference. In this case, however,

10

the change makes a tremendous difference in the parties' discovery and litigation tactics because good faith or bad faith is irrelevant to a straight breach theory. Under the circumstances presented, Stephenson "simply acted too late to burden the court and the defendant with a new theory of relief." *See id.*; *see also Schoenbaum v. E.I. DuPont de Nemours and Co.*, No. 4:05CV1108, 2009 WL 1045469, at *5 (E.D. Mo. April 20, 2009) (refusing to allow amendment to add theories of relief where the defendants had been preparing for class-certification hearing and defendant's "approach to class certification would have been managed quite differently if these new theories had been timely advanced"). Therefore, the Court will analyze the Motion for Certification based exclusively on the § 2-305(2) theories of breach that are clearly encompassed within the Amended Complaint, that have been asserted throughout this litigation, and that were outlined by the Court in its 12(b)(6) Order.

B.    "Availability" Theory Related to Injury and Damages

Citgo has also moved to strike Stephenson's availability theory of injury and damages as untimely asserted. (*See* Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 9-10.) In order to understand the availability theory of injury, a brief explanation of Stephenson's original theory of injury is necessary. In the "typicality" allegations related to class certification, the Amended Complaint provides that "[e]ach Class member has sustained damage as a result of CITGO's wrongful conduct in the same manner as Plaintiff – that is, each Class member *paid more for CITGO gasoline than the Favored Distributors at the same terminals*, in violation of CITGO's contracts with the members of the Class." (Am. Compl. ¶ 51 (emphasis added).) Thus, the Amended Complaint indicates that Disfavored Distributors sustained an injury because they "paid more" than the Favored Distributors. By way of example, Stephenson alleged that "Modern Oil

11

received formula-based pricing" and "*would purchase* the same gasoline as Stephenson Oil at the same terminal but for a significantly cheaper price." (*Id.* ¶ 33 (emphasis added).)

In its opposition to the Motion for Certification, Citgo first raised the issue of Stephenson's lack of standing based on its lack of actual injury.  Citgo argued that Stephenson has not suffered an actual injury because neither Susser or Modern Oil, the two Favored Distributors mentioned in the Amended Complaint, actually paid their "favored" formula price at any terminals from which Stephenson lifted during the class period.  In its reply brief, Stephenson did not dispute this assertion factually, and it became clear during the class-certification hearing that Stephenson could not do so.[10]  Instead, Stephenson attempted to remedy this standing problem by positing that Stephenson's injury did not occur by virtue of an *actual purchase or payment* of the favorable price by a Favored Distributor at the same terminal but instead occurred by virtue of the *availability* of a favorable price to a Favored Distributor at the same terminal.  This is the "availability theory" of injury, which Stephenson now asserts as the class-wide injury in this case.  *See also infra* Part III.B (further explaining availability theory).  At the class-certification hearing, Mukamel testified in accordance with the availability theory and prepared Plaintiff's Exhibits 98 and 103 in accordance with such theory.  The sole question addressed in this section is whether the availability theory and any evidence related thereto must be stricken as untimely.

Unlike the straight breach theory, the availability theory has been timely asserted and will be considered in ruling on the pending motions.  Even assuming the availability theory is not reasonably encompassed within the Amended Complaint, it has nonetheless been raised in a timely

_____

[10]  During the class-certification hearing, the Court expressed its concerns regarding standing and encouraged the parties to make arguments and present evidence on the standing question.

manner.  Stephenson contends that documents showing Modern Oil's failure to make any "formula price" purchases at the relevant terminals were allegedly "missing" during the discovery process and that Stephenson first received the relevant documents in Citgo's opposition to the Motion for Certification.  Thus, Stephenson contends that "any delay in raising the availability theory was caused by Citgo's own conduct."  (Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Plaintiff's Proposed Expert Regarding Injury 9.)  Although the Court makes no finding as to this discovery dispute, the dispute highlights the important difference between a theory of injury and an entirely new theory of contract recovery.  An injury or damages theory may necessarily evolve through the course of discovery and is more dependent on certain facts that may be unknown at the time of filing a complaint, which occurred in this case.  In the Court's view, Stephenson's change in the injury and damages theory it wishes to present to a jury, *via* Mukamel's testimony, is distinguishable from Stephenson's attempt to inject a new theory of contract recovery into the case at this stage of the proceedings.  The latter would result in severe prejudice and/or the need for significant extensions of time for Citgo to reconsider its strategies and litigation tactics, while the former results in less disruption to the overall litigation.  In addition, class certification was the first procedural phase requiring the Court to examine Stephenson's injury and damages.  This is in contrast to the straight breach theory, which should have been raised and explained during the Rule 12(b)(6) stage.  Most importantly, Citgo has not suffered actual prejudice resulting from any untimeliness of the availability theory.  During the class-certification hearing, Citgo presented arguments and evidence responding to the availability theory.  Citgo has had ample opportunity to prepare for and respond to the availability theory.  Therefore, the availability theory and any evidence related thereto presented in support of the Motion for Certification will not be stricken as untimely.

### III.    Standing

Any analysis of class certification must begin with the issue of standing.  *Vallario v. Vandehey*, 554 F.3d 1259, 1269 n. 7 (10th Cir. 2009); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000) ("[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.").  In the class-action context, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure* § 1785.1 (3d ed. 2005) ("An appropriate application of standing in class suits necessitates an inquiry into whether the class members have been injured by defendant's conduct, thereby presenting a 'live' case.").  "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

Citgo argues that, considering the factual record presented at the class-certification stage, Stephenson lacks Article III standing to pursue any claim on behalf of the proposed class.  Thus, a threshold issue presented to the Court is whether Stephenson, the only named Plaintiff, has Article III standing to pursue a § 2-305(2)-based breach of contract claim on behalf of the proposed class of Disfavored Distributors.

14

A.   Elements and Burden of Proof

"Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies." *Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010). "To establish standing, plaintiffs bear the burden of demonstrating that they have suffered an injury-in-fact which is concrete and particularized as well as actual or imminent; that the injury was caused by the challenged sections; and that the requested relief would likely redress their alleged injuries." *Id.*; *see also Rector v. City and County of Denver*, 348 F.3d 935, 942 (10th Cir. 2003) ("To satisfy constitutional standing requirements, a plaintiff must demonstrate the presence of three elements: (1) injury in fact – meaning the invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct – meaning that the injury can fairly be traced to the action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision – meaning that the prospect of obtaining relief from . . . a favorable ruling is not too speculative."). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Rector*, 348 F.3d at 943 (quotations omitted). The Supreme Court explained the plaintiff's burden of proving standing at various stages of the proceedings as follows:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lewis*, 518 U.S. at 357-58.

In this case, the procedural posture of the standing challenge is in opposition to a motion for class certification. The standing challenge was made after the Court ruled on a Rule 12(b)(6) motion and after considerable discovery on all standing-related issues, but before the filing of any motion pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). So this standing challenge arises somewhere in between the pleading stage and the Rule 56 stage. With respect to the burden of proving standing during the class-certification stage, courts have stated that "[t]he class certification stage is a hybrid of these two stages [motion to dismiss and motion for summary judgment], in that the court looks beyond the pleadings but does not inquire into the merits of the case." *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 609 (N.D. Ga. 1997) (requiring, at class-certification stage, named class representatives to "adduce evidence showing they purchased carpet from the named Defendants or their co-conspirators during the alleged conspiracy period" and allowing them time to "tender the evidence described above . . . so that the Court can confirm whether Plaintiffs possess standing to proceed as the named representatives of the proposed class"); *see also Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64, 87 (M.D. Tenn. 2004) (explaining that "the manner and degree of evidence required to satisfy plaintiffs' burden of proof at class certification is higher than the burden at the motion to dismiss stage"); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 663-64 (N.D. Ga. 2001) (finding, at class-certification stage, that plaintiffs lacked standing to bring certain claims after considering affidavits and deposition testimony related to dates of filing EEOC charges); *In re First Am. Corp. ERISA Litig.*, No. 07-01357, 2009 WL 928294, at *2 (C.D. Cal. Apr. 2, 2009) (explaining that "the standing issue

should be considered at the class-certification stage, at which point, unlike on a motion to dismiss, the would-be class representative must show standing, rather than merely allege it").

In accordance with the above law, the Court finds it proper to "look beyond the pleadings" and hold Stephenson to a burden akin to a Rule 56 burden.  The Court will require Stephenson to "set forth by affidavit or other evidence specific facts" demonstrating its standing.  *Lewis*, 518 U.S. at 357-58.  The Court will accept such facts as true, and then determine if there are any genuine disputes of fact that must be presented to a jury for resolution of the standing question.  *See id.* Moving beyond the pleadings is particularly appropriate here because Stephenson has conceded that the allegations of injury in the Amended Complaint, at least as specifically related to alleged Favored Distributors Susser and Modern Oil, were belied by the actual evidence because neither Susser or Modern Oil ever paid the formula price at a terminal common to Stephenson, as alleged in the Amended Complaint.[11]  Instead, to demonstrate its standing, Stephenson now relies upon the availability theory of injury and corresponding evidence, including evidence that formula prices were available at the Tulsa terminal to two new Favored Distributors: Truman Arnold ("Truman"), and 4-Front Petroleum ("4-Front").  (*See, e.g.*, Doc. 204, Exs. 98 (showing Stephenson's injury and damages in relation to Truman's "available" formula price) and 103 (showing Stephenson's injury and damages in relation to 4-Front's available formula price); *see also* Class Cert. Hr'g Tr. 21-24 (counsel's argument related to Truman and 4-Front), 126-28 (Mukamel's testimony related to Truman and 4-Front).)  Thus, standing cannot meaningfully be analyzed in light of the allegations

---

[11]  In fact, Stephenson cannot identify *any* Favored Distributors that paid the formula price at any terminals from which Stephenson purchased, thus prompting the availability theory.

in the Amended Complaint, and the Court has before it a significant evidentiary record regarding standing.

In addition, neither party has requested additional discovery or represented that resolution of the standing issue should be delayed pending further opportunity for an evidentiary presentation. Thus, judicial economy is best served by requiring Stephenson to make a Rule 56-type evidentiary showing in support of standing at this class-certification stage. *See generally Black Faculty Ass'n of Mesa College v. San Diego Cmty. College Dist.*, 664 F.2d 1153, 1157 n.3 (9th Cir. 1981) (noting that "a pretrial certification hearing might have illuminated the standing problems, and thus avoided the expense of a trial and an appeal"); *see also Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) ("The district court erred by not demanding such a showing before it certified the class. Had it done so, it would have found that plaintiffs had demonstrated neither injury nor causation.") (footnote omitted).  The Court is mindful, however, that it may not inquire into the merits in addressing whether Stephenson has standing. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. at 609 (stating rule in context of class certification); *see also Parker v. D.C.*, 478 F.3d 370, 377 (D.C. Cir. 2007) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim."); *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1092-94 (10th Cir. 2006) (cautioning against "confusing standing with the merits" and explaining that courts should "avoid using standing concepts to address whether plaintiff has stated a claim").[12]

---

[12]  The Tenth Circuit has also explained that "at the class certification stage a district court must generally accept the substantive, non-conclusory allegations of the complaint as true." *See Vallario*, 554 F.3d at 1265.  However, in this case, the Court finds no reason to accept as true any allegations in the Amended Complaint regarding injury that are now known to be false.  *See id.* (explaining that a district court cannot conduct Rule 23's "searching inquiry with a clearly

B.      Analysis

Citgo challenges the first element of standing – whether Stephenson has suffered "an injury in fact – meaning the invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Rector*, 348 F.3d at 942.  Citgo essentially makes two arguments related to Stephenson's lack of injury: (1) for purposes of the § 2-305(2) claim asserted in this case, Stephenson does not suffer an actual injury unless and until a Favored Distributor *pays* the good-faith price, and any injury suffered by virtue of the good-faith price simply being *available* to a Favored Distributor at the same terminal is insufficient to satisfy Article III's requirements; and (2) even assuming a sufficiently concrete injury occurs by virtue of availability of the good-faith price, Stephenson has not met its burden of showing that it suffered such an injury because there was no good-faith price available to a Favored Distributor at the Tulsa terminal during the class period.[13]  (*See* Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 6-9; Def.'s Reply in Support of Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 3-5.)  Stephenson argues that: (1) its injury is simply that "it paid more for gasoline than its contract with Citgo required it to pay;" (2) whether the availability theory does or does not support a finding of § 2-305(2) injury goes to the merits of its case and may not be decided at the class-certification stage; and (3) it has demonstrated, as a factual matter, that Favored Distributors

_____

erroneous view of the alleged facts" and that a district court abuses its discretion by resting a class-certification decision on a clearly erroneous fact).  In addition, Stephenson has not urged the Court to decide the standing question based on the Amended Complaint but has instead presented other evidence in support of its standing.

[13]  The proposed class period is July 1, 2004 to the present.

had formula prices "available" to them at the Tulsa terminal.  (*See* Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 2-8.)[14]

      1.    *Does Availability of Good-Faith Price to Favored Distributors at Tulsa Terminal Give Rise to Concrete Injury to Stephenson?*

As explained above, Stephenson's original theory of injury asserted in the Amended Complaint was that it, as a representative of a class of Disfavored Distributors, paid the bad-faith price (in this case, the rack price), while Favored Distributors at the same terminal paid the good-faith price (in this case, the formula price).  (*See* Am. Compl. ¶ 51.)  This injury, however, did not occur.  It is undisputed, at this point in the proceedings, that no Favored Distributor was charged or ultimately paid the formula price at either terminal from which Stephenson lifted gasoline during the class period.  In addition, the Court has rejected the straight breach theory as untimely, and any injury suffered by virtue of a straight breach theory is rejected.[15]  Therefore, Stephenson's standing must be predicated on the injury of paying the bad-faith price, while a Favored Distributor had the good-faith price available to it at the Tulsa terminal.  For purposes of the Motion for Certification only, the Court accepts Stephenson's proposed definition of availability as "contractually available."  (*See* Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 5-8 (arguing that 4–Front and Truman had formula price "available" to them by virtue of their

---

    [14]  Due to the relative newness of the availability theory and the Court's allowing Mukamel to submit certain exhibits following the class-certification hearing, much of the standing debate is contained within briefing regarding Mukamel's testimony.  The Court has also considered all standing arguments made in the briefing on the Motion for Certification.

    [15]  Based on this ruling, the Court rejects Stephenson's argument that its injury was simply paying "more for gasoline than its contract with Citgo required it to pay."  For the same reasons explained *infra* Part II.A, the Court's standing analysis is limited to whether Stephenson has standing to assert a § 2-305(2)-based breach of contract claim.

contracts).)  Thus, Stephenson's argument at trial would be as follows: the rack price it paid was a bad-faith price under § 2-305(2) because such price was discriminatory and/or commercially unreasonable, in light of the good-faith price contractually available to at least one Favored Distributor at the Tulsa terminal.  For purposes of Article III standing, the Court must determine if mere contractual availability of the good-faith price to a Favored Distributor gives rise to a sufficiently "concrete" and "actual" injury to Stephenson.

Case law indicates that there is not a single type of "injury" flowing from bad-faith setting of an open-price term prohibited by § 2-305(2).  Instead, the injury and measure of damages depend on the type of bad-faith pricing at issue and the facts of each case.  *See, e.g., Tom-Lin Enter., Inc. v. Sunoco, Inc.*, 349 F.3d 277, 283-86 (6th Cir. 2003) (indicating that, where allegations involve subjective bad faith, such as adopting a business plan to increase "jobber retailers" relative to the number of independent dealers in the area, injuries might involve lost profits and reduced revenue) (finding that claims could not survive summary judgment because, *inter alia*, no such injuries were alleged); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002) (injury resulting from price setting with subjective, bad-faith motive to drive the plaintiffs out of business was "loss of competitive position and profit" to plaintiff franchisees); *Schwartz v. Sun Oil Co., Inc.*, No. 96-72862, 1999 U.S. Dist. LEXIS 22257 (E.D. Mich. Dec. 9, 1999) (alleged injury was having to pay a discriminatory and commercially unreasonable price; jury awarded damages that were purportedly based on difference between bad-faith price the plaintiff paid and good-faith price the plaintiff would have received) (trial court set aside the verdict based on insufficient evidence of price discrimination or commercial unreasonableness); *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 436 (Tex. 2004) (indicating that, if allegations are subjective dishonesty in application of a non-

discriminatory, commercially reasonable price, a plaintiff must allege a "commercial injury distinct from the price increase itself"); *United Energy Distribs., Inc. v. ConocoPhillips Co.*, No. 07-CV-2644, 2008 WL 4458991, at *8-9 (D.S.C. Sept. 30, 2008) (applying *Shell Oil Co.* and concluding that alleged loss of value of incentive payments due under contracts, as a result of alleged bad-faith pricing, may constitute a commercial injury distinct from the price increase itself).[16]

In this § 2-305(2) case, Stephenson's claimed injury is paying the bad-faith price each time it made a purchase at the Tulsa terminal, while a good-faith price was contractually available to a Favored Distributor for its purchases at the Tulsa terminal. Stephenson seeks to recover as damages the price differential between the bad-faith price it paid and the good-faith price it should have paid. (*See, e.g.*, Doc. 204, Pl.'s Exs. 98 and 103 (calculating Stephenson's damages for April 2006 as difference between rack price it paid and Truman's available formula price, and calculating damages for July 2004 as difference between rack price it paid and 4-Front's available formula price).)[17] In support of this theory of injury and damages, Plaintiff relies upon *Schwartz v. Sun Oil Company, Incorporated*, No. 96-72862, 1999 U.S. Dist. LEXIS 22257 (E.D. Mich. Dec. 9, 1999) ("*Schwartz I*").[18] In that case, the plaintiffs were operators of retail service stations in the Flint, Michigan area,

---

[16]   The leading treatise on the UCC provides that if a seller fixes an open-price term in bad faith, the buyer "may treat the sale as cancelled." 2A *Lawrence's Anderson on the Uniform Commercial Code*, § 2-305:32 (entitled "Requirement of good faith – Remedy for bad faith determination of price"). This remedy is not sought by Stephenson. The treatise further provides that a party that refuses to negotiate the open price term in good faith is liable for breach of contract, *see id.*, which is also not relevant here. These were the only two "remedies" explained in the treatise.

[17]   Stephenson's sole theory of injury is being overcharged, and the only damages Stephenson seeks to recover is the price differential. Stephenson has not alleged any other injury, such as lost profits or other competitive injury.

[18]   At the class-certification hearing, the Court asked Stephenson if it was aware of any authority other than *Schwartz I* discussing injury and damages in a similar § 2-305(2) price

and the defendant was a refiner and marketer of oil who set an open-price term in the plaintiffs'

agreements.   The plaintiffs brought claims under the Robinson-Patman Act and Michigan's

equivalent of § 2-305(2).  The court referred to the § 2-305(2) claims as the "open-price claims."

After a ten-day trial, a jury awarded the plaintiffs $132,855 in damages on the open-price claims.

> At trial, the jury was instructed as follows with respect to damages on the open-price claims:
>
> *If you find Sun did not set its prices in good faith, plaintiffs may recover as damages the difference between the price . . . they paid for motor fuel and the good faith price, as defined in these instructions, they would have paid.  It is the plaintiffs' burden of proof, however, to prove what the good faith price should have been for each location [and] for each purchase of motor fuel they made from Sun between January 1, 1995 and July 31, 1997.*  Lost profits, lost related sales or lost going concern value damages are not elements of damages under this claim.[19]  As you have seen from the verdict form, you must determine the amount of damages separately for each of the locations involved in the Open Price claims and separate periods for each of the locations.

*Id.* at *56-57 (emphasis and footnote added).  Following trial, the court vacated the verdict and

entered judgment in favor of the defendant on the open-price claims because the plaintiffs failed to

present sufficient evidence of discrimination, commercial unreasonableness, or what the good-faith

price should have been.  The court stated:

> Here, plaintiffs offered no evidence that [the defendant's] DTW price formula was not followed or was a formula uniquely applied to plaintiffs or did not follow an industry norm. [The defendant's] DTW pricing, as far as the record was concerned, was a 'posted price,' 'price in effect' and a 'market price.'  Additionally, the record is silent as to the good faith price plaintiffs say [the defendant] was required to charge.

---

discrimination case.  Stephenson's counsel indicated that he was not.

[19]  As in *Schwartz I*, Stephenson does not claim lost profits or lost sales as its injury in fact.  Its alleged injury is paying a bad-faith price, resulting in thousands of dollars worth of overcharges for the class period.

*Id.* at \*59.  This holding was affirmed on appeal.  *See Schwartz v. Sun Co., Inc. (R&M)*, 276 F.3d 900, 903-05 (6th Cir. 2001) (affirming setting aside of verdict on open-price claims but reversing trial court's setting aside of the verdict on the Robinson-Patman claims).  Stephenson contends that, using the *Schwartz I* jury instruction as a template, its injury is paying a bad-faith price, in comparison to the good-faith price contractually available to a Favored Distributor at the same terminal.  Citgo argues that, even applying the *Schwartz I* jury instruction as a template for Stephenson's § 2-305(2) injury, the comparator good-faith price must be one that was actually paid by a Favored Distributor in order for Stephenson to have suffered a concrete and actual injury.

The Court concludes that Stephenson has not met its burden of showing that it suffered any concrete, non-speculative injury flowing from bad-faith pricing prohibited by § 2-305(2).  With respect to price discrimination prohibited by § 2-305(2), cases uniformly refer to prices that are actually *charged* to the allegedly favored purchaser and not prices that are merely *available* to the allegedly favored purchaser.  *See Wayman v. Amoco Oil Co.*, 923 F. Supp. 2d 1322, 1347 (D. Kan. 1996) (explaining that § 2-305(2)'s chief concern is to prevent "suppliers from *charging* two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons") (emphasis added); *Shell Oil Co. v. HRN, Inc.,* 144 S.W.3d 429, 434 (Tex. 2004) (same) (quoting *Wayman*); *Autry Pet. Co. v. BP Prod. N. Am., Inc.*, 334 Fed. Appx. 982, 986 (11th Cir. June 26, 2009) (same) (quoting *Wayman*); *Marcus Dairy, Inc. v. Rollin Dairy Corp.*, No. 05-CV-589, 2008 WL 4425954, at \*8 (D. Conn. Sept. 24, 2008) (same) (quoting *Wayman*) (price-discrimination allegations were that the price setter charged a competitor 25 or 26 cents less per gallon than it *charged* the claimant); *see also Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 290 (4th Cir. 1990) (affirming district court's grant of summary judgment because, *inter*

*alia*, the summary judgment evidence showed that the defendant "*charged* all its customers . . . the same posted rack price") (emphasis added); *Casserlie v. Shell Oil Co.*, 902 N.E.2d 1, 6 (Ohio 2009) (explaining that "[a] discriminatory price could not be considered a 'posted' or 'market' price, because, in effect, the seller is not being 'honest in fact' about the price that it is charging as a posted price, since it is *charging* a different price to other buyers") (emphasis added); *Bob's Shell, Inc. v. O'Connell Oil Assocs., Inc.*, No. A.03-30169, 2005 WL 2365324, at *6 (D. Mass. Aug. 31, 2005) (denying summary judgment on § 2-305(2) price-discrimination claim where record showed that "[the defendant] charged [the plaintiffs] substantially higher prices than it *charged* independent dealers") (emphasis added); *ISP Mineral Prods., Inc. v. GS Roofing Prods. Co.*, No. CIV.A.3:97-CV-2326R, 1999 WL 102818, at *3 (N.D. Tex. Feb. 22, 1999) (denying motion to dismiss where counter-claimant alleged that "while it was paying the published list price, [the plaintiff] was offering substantial discounts from that price to its other customers" and further alleged that "[the plaintiff] . . . *sold* identical roofing granules to other purchasers at a substantial discount from its published list price").[20]  Based on the above law, this Court held in its Order on the Motion to Dismiss that "[i]n the context of § 2-305(2), discriminatory pricing means '*charging* two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons.'" (12(b)(6) Order 13) (emphasis added) (quoting *Wayman*).  Thus, the

---

[20]  In one case cited by the Court in its Order on the Motion to Dismiss, the court used the word "provided," which is ambiguous as to whether the plaintiff alleged actual purchases by a competitor at the favored price.  *See Dixie Gas & Food, Inc. v. Shell Oil Co.*, No. 03-C-8210, 2005 WL 1273273, at *5 (N.D. Ill. May 25, 2005) (allegations that the defendant "unjustifiably *provided* preferred tank wagon pricing to company-owned and/or other preferred dealers" were "sufficient to state a claim that [the defendant] did not set an open price term ... in good faith") (emphasis added).

typical injury in a § 2-305(2) price-discrimination case occurs by virtue of *actual* price discrimination – two similarly situated buyers paying different prices.[21]

But this injury has not occurred here.  The only injury Stephenson has suffered is being the victim of potential or hypothetical price discrimination.  Stephenson cannot be said to have suffered a concrete, actual injury by paying the alleged bad-faith price, in the absence of a Favored Distributor paying the alleged good-faith price.  Stephenson paid the rack price, and, evidently, so did every Favored Distributor purchasing at the Tulsa terminal during the class period.  Thus, the rack price (which is Stephenson's contractually agreed price) ceases to be a bad-faith price, and Stephenson has suffered no actual injury. Stephenson could *potentially* suffer an actual injury if a Favored Distributor qualifies for and takes advantage of a contractually available formula price at a terminal from which Stephenson lifts gasoline.  But this has not occurred and may never occur, rendering Stephenson's theory of injury hypothetical and overly speculative.[22]  For similar reasons, a contractually available price that was never actually utilized by a Favored Distributor is an overly speculative figure to present to a jury as the good-faith comparator price, under the *Schwartz I* instruction proposed by Stephenson.  *See Schwartz I,* 1999 U.S. Dist. LEXIS 22257, at *56-57 (instructing jury that "[i]f you find Sun did not set its prices in good faith, plaintiffs may recover as damages the difference between the price . . . they paid for motor fuel and the good faith price, as defined in these instructions, they would have paid").  Due to the speculative nature of the injury,

---

[21]  "Paid" may be a more precise term than "charged" in the context of oil and gas pricing.  This is because the price charged at the terminal may not be the price ultimately paid for the gas, after application of various discounts.  *See, e.g.*, *infra* Part III.B.2.

[22]  Indeed, the class period is from July 1, 2004 to the present, and Stephenson has been unable to identify any Favored Distributor who paid the formula price at the relevant terminals.

there is no discernable method of choosing the good-faith comparator price for each terminal at any given time.  In the case of Stephenson, should it be 4-Front's alleged contractually available price, Truman's alleged contractually available price, the lowest available formula price between the two, or should it somehow vary depending on the month (as indicated by Mukamel's proposed calculations in Plaintiff's Exhibits 93 and 108)?  If it varies by month between Favored Distributors, what is the meaningful basis for such variance?  These problems demonstrate the inherent speculativeness of the availability theory of injury.  Stephenson has not met its burden of showing that it suffered a concrete flowing from § 2-305(2)'s prohibition on price discrimination in setting open price terms.

With respect to the commercial unreasonableness theory of § 2-305(2), the same analysis applies.  Unlike some other theories of commercially unreasonable pricing that may lend themselves to a competitive injury divorced from any good-faith comparator price, Stephenson's theory of commercial unreasonableness is directly tied to price discrimination *vis a vis* the Favored Distributors.  (*See* Am. Compl. ¶ 21 ("The standard commercial practice in the gasoline industry was, and continues to be, that generally the sellers offer the wholesale price to distributors at each terminal on a nondiscriminatory basis, *i.e.*, each distributor purchasing the same gasoline product on the same date at the same terminal would be charged the same price."); *see also* Smith Decl. ¶¶ 19-25, Ex. A to Pl.'s Resp. to Mot. to Strike Smith Decl. (setting forth the industry standard, Citgo's alleged discriminatory pricing scheme, and concluding that "Citgo's pricing scheme was and is contrary to reasonable commercial standards of fair dealing in the industry because the scheme resulted in substantial overpayments by the majority of Citgo distributors *compared to the payments made by those distributors who received the special pricing terms* for gasoline purchased at the same

terminal.") (emphasis added).)  Thus, even were the Court to allow Smith to change his testimony to encompass the availability theory of injury, the injury flowing from a violation of industry standards is still speculative for the reasons explained above with respect to price discrimination. Stephenson has therefore also failed to meet its burden of showing that it has suffered a concrete injury flowing from § 2-305(2)'s prohibition on commercially unreasonable pricing.

In addition to *Schwartz I*, Stephenson relied upon cases utilizing the "equal-footing" doctrine to confer standing upon a plaintiff.  *See, e.g.*, *Schutz v. Throne*, 415 F.3d 1128, 1133-34 (10th Cir. 2005).  Stephenson urges the Court to extend the equal-footing standing doctrine to the facts presented, arguing that "Citgo's failure to provide the equal-opportunity Marketer Price promised in the Citgo Contract deprived the Disfavored Distributors of the opportunity to compete on equal footing with the Favored Distributors.  This is sufficient to satisfy the Article III standing requirement."  (Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 3 n.1.)  Citgo contends that this argument was made in "apparent desperation" and has no application to the facts presented.  (Def.'s Reply in Support of Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 9.)

The equal-footing doctrine is limited, at least in Supreme Court and Tenth Circuit law, to equal-protection challenges to legislation.  *See Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("When *the government* erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' *in an equal protection case* of this variety is the denial of equal treatment resulting from the

imposition of the barrier, not the ultimate inability to obtain the benefit.") (emphasis added); *Schutz,* 415 F.3d at 1133 (same).  Here, the government has not erected any barrier, there is no equal-protection claim, and the Court finds no legal basis to extend this line of decisions to the facts presented.

In sum, even assuming Citgo entered secret, discriminatory, commercially unreasonable contracts with Favored Distributors and that Stephenson succeeds on the merits of its § 2-305(2)-based breach of contract claim, Stephenson has not shown a sufficiently concrete injury simply by virtue of the existence of such discriminatory contracts.  Instead, Stephenson's alleged injury is speculative, illusory, and requires assumption upon assumption.  *Cf. Stewart v. Kempthorne*, 554 F.3d 1245, 1254 (10th Cir. 2009) (finding counties suffered no direct injury and lacked standing to challenge Bureau of Land Management's issuance of certain grazing permits because counties' theory of injury required the court to make several assumptions, including that the issuance of the permits would decrease tax revenues, that there would be a decrease in grazing, and that the decrease in grazing would negatively impact the aesthetic appeal of the counties) ("We cannot make such assumptions, and therefore, the injury argument at this stage is merely conjectural or hypothetical"); *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (plaintiffs failed to allege injury in fact because, *inter alia*, the theory of injury asserted - "that some iPods have the 'capability' of producing unsafe levels of sound and that consumers 'may' listen to their iPods at unsafe levels combined with an 'ability' to listen for long periods of time" – was too "conjectural and hypothetical"); *Day v. Bond*, 500 F.3d 1127, 1133 (10th Cir. 2007) (finding that plaintiffs' second and third theories of injury under an equal-protection claim were not sufficiently concrete and non-speculative to support standing); *Bell v. Am. Traffic Solutions, Inc.*, No. 09-10722, 2010 WL

1141639, at *2 (5th Cir. Mar. 23, 2010) (holding that motorists did not have standing to bring negligence claim against contractor because, *inter alia*, one asserted theory of injury was "illusory"); *Vaughn v. Consumer Home Mortg. Co., Inc.*, No. 01-CV-7937, 2006 WL 2239324, at *7 (E.D.N.Y. August 4, 2006) (holding that plaintiffs lacked standing because their theory of injury – that they would suffer an intolerably high risk of being deceived again when they re-entered the housing market – was too speculative and remote). These cases are all factually distinguishable, but they demonstrate that an overly speculative theory of injury can warrant dismissal for lack of standing.[23]

2. *Were Good-Faith Prices Available to Favored Distributors at the Tulsa Terminal?*

Alternatively, Citgo argues that Stephenson has not shown Article III standing because, even assuming that contractual availability of a good-faith price to a Favored Distributor results in a concrete injury to Stephenson, Stephenson has failed to satisfy its burden of showing that the good-faith price was ever contractually available to any Favored Distributor at the Tulsa terminal during the class period. Stephenson contends, in contrast, that Favored Distributors 4-Front and Truman "were each party to a formula addendum that entitled them to a formula price" and that "[b]oth of

---

[23] Stephenson contends that, if the Court finds no injury in fact under its availability theory, it is impermissibly reaching the merits. However, the "merits" are whether Citgo violated the law by engaging in discriminatory or commercially unreasonable pricing, and the Court's standing analysis does not turn on a failure of proof as to any element of this claim. Instead, the Court holds that, assuming Stephenson can prove such claim and succeed at trial, Stephenson cannot show that it suffered a sufficiently concrete and non-speculative injury resulting therefrom. *See Day*, 500 F.3d at 1137-38 (explaining that, although court must assume plaintiff will "prevail on his merits argument – that is, that the defendant has violated the law," "there is still work to be done by the standing requirement, and Supreme Court precedent bars us from assuming jurisdiction based upon a hypothetical legal injury").

these formula addenda were applicable to the Tulsa Terminal where Stephenson purchased at rack price."  (Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 5.)   In order to survive this factual challenge to standing, Stephenson must establish a triable question of fact as to whether: (1) 4-Front had a formula price available to it during the class period, or (2) Truman had a formula price available to it during the class period.   For reasons explained below, Stephenson has failed to do so, and the factual availability question issue may be resolved as a matter of law.

a.      <u>4-Front</u>

On August 16, 2001, Citgo and 4-Front entered into an Addendum to Distributor Franchise Agreement ("4-Front Addendum").   The 4-Front Addendum provides:

> The purchase price for gasoline shall equal Citgo's posted net rack price for applicable grade of gasoline at the applicable terminal as of the date of lifting less a discount of [$x.xx] per gallon (the "Discount").
> . . .
> . . . [T]he Discount is only earned by [4-Front] if [4-Front] ratably lifts between ninety percent (90%) and one hundred ten percent (110%) of its contract volume under the [Distributor Franchise Agreement] during the applicable month.
> [4-Front] shall pay CITGO's posted rack prices in accordance with CITGO's standard payment terms.  After the end of each month CITGO shall credit [4-Front] the amount of the Discount that  [4-Front] has earned during the previous month.

(Ex. 37 to Pl.'s Reply in Support of Mot. for Class Certification, at ¶¶ 2, 2.2, 3.)  It is not disputed that the Tulsa terminal was an "applicable terminal" under the 4-Front Addendum.  It is also not disputed that the 4-Front Addendum remained in effect at least through June 22, 2006, during a portion of the class period.  (*See* Ex. 42 to Pl.'s Reply in Support of Mot. for Class Certification, CITGO email dated June 22, 2006, indicating that 4-Front continues to be identified as a formula marketer).  The Discount, as it is defined in the 4-Front Addendum, was contractually "available" if 4-Front "ratably lift[ed] between ninety percent (90%) and one hundred ten percent (110%) of its

31

contract volume under the [Distributor Franchise Agreement] during the applicable month."  (Ex. 37 to Pl.'s Reply in Support of Mot. for Class Certification, at ¶ 2.2 )  Thus, Stephenson has presented evidence that 4-Front had a contract in place during some portion of the class period that allowed 4-Front to:  (1) purchase gasoline at the "Citgo posted net rack price,"[24] and (2) if 4-Front satisfied certain contingencies during the relevant month, receive a credit making its purchase price equal to x.xxx less the "Citgo posted net rack price."

As an initial matter, the Court finds that, in order for the formula price to be "contractually available" to a Favored Distributor, the Favored Distributor must have satisfied the relevant contractual conditions precedent to its receipt of the formula price.  Fatal to its standing, Stephenson has not shown or created a triable question of fact as to whether, for any months during the class period, 4-Front satisfied the contractual prerequisites and therefore had the formula price contractually "available" for any potential purchases at the Tulsa terminal.  It is not disputed that, in February 2004, prior to the beginning of the class period, 4-Front was forced into bankruptcy. An internal CITGO document entitled "Annual Opener Review (3-1-04)" provides:

> On 2-24-04, immediately following our review period (Feb. 2003-Jan. 2004), CITGO and other debtors forced 4-Front into bankruptcy. 4-Front's parent company (Hale Hassell) and one of its other subsidiaries, Git-n-Go, has previously filed bankruptcy. Since that time, any formula settlements for 4-Front have been set aside awaiting rulings from the Bankruptcy court.  We are currently working with CITGO's legal department and outside council to determine the best approach to cancel or amend the existing price addendum due to the bankruptcy as well as the following non-compliance issues: (1.) Extream [sic] poor ratability[;] (2.) Poor projected economics for CITGO based on increased costs (PDC, capital, mktg exp) as well as the current [xxx] cpg discount[;] (3.) 8 IVP failures YTD as of 4-2004, due to several store closings as a result of the Git-n-Go bankruptcy[;] [and] (4.) Decreased volumes from

---

[24] The "Citgo posted net rack price" is defined in the 4-Front Addendum as the "Citgo posted rack price minus any applicable payment discount (typically 1%)."  (*Id.* at ¶ 2.1.)

a high of 58 mmgpy to a 2004 projected volume of 39 mmgpy (Q1, 2004 annualized) due to numerous Git-n-Go store closings[.]

(*See* Ex. 39 to Pl.'s Reply in Support of Mot. for Class Certification, at CITGO0182428.)  It is also not disputed that 4-Front, while in bankruptcy, made only one purchase of 989 gallons of gasoline on July 1, 2004, paid the rack price for such purchase, and did not receive a formula credit for such purchase.  (*See* Citgo's Notice of Submission of Selected Exhibits Pursuant to this Court's July 15, 2010 Order, Doc. 247 at ¶¶ 1-23 (explaining and attaching relevant portions of Citgo's Class Cert. Hr'g Exs. 66C, 66D and demonstrating that Citgo made this single purchase at the rack price and did not receive a formula credit).  Therefore, Stephenson has not shown that, or presented any disputed factual questions as to whether, this single purchase by 4-Front on the first day of the class period was sufficient to satisfy the conditions precedent to receipt of the formula price.  As argued by Citgo at the hearing, if the formula price were "contractually available" to 4-Front, it would have received the formula rebate for the single purchase it did make.  It did not.  This indicates that the formula price was not contractually available for any other hypothetical purchases that could have been made by 4-Front during the class period.  Indeed, it is not disputed that 4-Front was in bankruptcy, made only a single purchase at the Tulsa terminal during the class period, and therefore did not qualify for the formula rebate at any time during the class period.[25]

---

[25] The Court allowed Stephenson to respond to Citgo's Notice of Submission of Selected Exhibits Pursuant to this Court's July 15, 2010 Order.  (*See* Doc. 251.)  Rather than dispute the facts set forth in Citgo's filing, Stephenson requests that the Court modify the class period to have a beginning date of July 1, 2003.  Although a court likely has discretion to modify a class period, as argued by Stephenson, the Court declines to do so here based on the untimeliness of the request.  All relevant proceedings have been conducted with a proposed class period of July 1, 2004, including discovery and the Court's evidentiary hearing on class certification.  It has been six months since the Court conducted such hearing, and Stephenson made no requests to modify the class period during that time.  It is simply too late to alter the class period because this alteration will result in the need for significant extensions of time and additional discovery,

b.      Truman

On May 1, 2001, Truman entered into an Addendum to Distributor Franchise Agreement

("Truman Addendum").  (*See* Ex. 43 to Pl.'s Reply in Support of Mot. for Class Certification.)  The

Truman Addendum was terminated by Citgo on September 30, 2006, (*see* Citgo Class Cert. Hr'g

Ex. 68FFFFFFFFF at CITGO 382580, attached as Exhibit D to Doc. 247), and was therefore in

existence for the first fifteen months of the class period.  The Truman Addendum is significantly

more complicated than the 4-Front Addendum.  It provides:

> 3.      Gasoline is to be priced in accordance with subparagraphs 3.1, 3.2, and 3.3
> and paragraph 4 below.
>
> 3.1     *Gasoline that is sold for delivery to Truman Arnold stations that are
> currently branded with CITGO and that have not completed their branding
> commitment that is set forth in Schedule A (the "Committed Stations") shall be
> priced at CITGO's normal rack price.  A list of the Committed Stations with their
> respective branding commitment date is attached as Schedule A.  The Committed
> Stations shall be entitled to continue to receive such CITGO marketing program
> benefits for which they are currently enrolled.*
>
> 3.2     Gasoline that is lifted from the Southlake, Fort Worth, Arlington, Austin,
> Bryan/Hearne, Houston, Mt. Pleasant, *Tulsa*, Tyler, Waco, Oklahoma City, Caddo
> Mills, Memphis and West Memphis Terminals (the "Formula Terminals") and that
> *is sold for delivery to the Formula Stations, including Committed Stations after
> completion of their applicable Schedule A commitment period, shall be priced under
> the formula pricing provisions set forth in paragraph 4* and such Stations shall not
> be entitled to receive any CITGO marketing program, co-op advertising or brand
> enhancement benefits except for certain branding expenses which are discussed in
> paragraph 6.
>
> 3.3     Gasoline delivered to Truman Arnold's existing CITGO branded stations that
> are not subject to the branding commitment set forth in Schedule A *or that has
> satisfied their branding commitment set forth in Schedule A shall be priced under the
> formula pricing provisions of paragraph 4;* provided that the gasoline is lifted from
> the terminal that currently supplies the station, and such stations shall not be entitled
> to receive any CITGO marketing program, co-op advertising or brand enhancement
> benefits except for certain branding expenses which are discussed in paragraph 6.
> . . .

which the Court is unwilling to grant.  This last-minute effort to remedy Stephenson's standing
problem is rejected.

CITGO and Truman Arnold may agree, from time to time, to modify the list of terminals that are considered Formula Terminals.

4.      The purchase price for the gasoline that is delivered to a Formula Station and that is either lifted from either (i) a Formula Terminal, as described in subparagraph 3.2 or (ii) an existing terminal as described in subparagraph 3.3 shall equal a weighted average of the two lowest OPIS net rack prices for the applicable terminal and the applicable grade of gasoline as of the date of lifting, plus [$ x.xxx] per gallon, plus applicable taxes, if any.  In determining a weighted average, the second lowest OPIS net rack price shall be given twice the weight of the lowest OPIS net rack price.  Specifically to determine the weighed average, the lowest OPIS net rack price will be added to twice the second lowest OPIS net rack price and the sum will be divided by three. . . . Should the purchase price as determined herein exceed the posted CITGO's net rack price at the applicable terminal for more than three (3) days, it is agreed that the posted CITGO net rack price will be used as the purchase price during such period.

. . .

4.2      For purposes of this Addendum, the "net rack price" shall mean the posted rack price minus any applicable payment discount (typically 1%).  There are no additional payment discounts on this formula price.

. . .

5.      *Truman Arnold shall pay CITGO's normal rack prices in accordance with CITGO's standard payment terms.  Each month CITGO will compute Truman Arnold's total actual liftings for each terminal (the "Monthly Terminal Volume").  The Monthly Terminal Volume for each terminal will be prorated between Formula Stations and non-Formula Stations that are supplied from the particular terminal.*  The proration will be based on the CITGO Brand Master Volume between the Formula Stations and the non-Formula Stations that are supplied from the particular terminal.  *The formula price described in paragraph 4 above will apply to the lesser of (i) the prorated volume attributed to the Formula Stations or (ii) the CITGO Brand Master Volume of the Formula Stations.  This computation shall be made for each applicable terminal.  Within ten (10) business days of the following month, CITGO shall prepare a reconciliation between the formula price calculated under paragraphs 4 and 5 of this Addendum and the amount actually paid by Truman Arnold.  CITGO shall credit or debit Truman Arnold the amount that is due as a result of the reconciliation.*  Either party may conduct a review or audit of the other party's records for the purpose of determining compliance with the provisions of the Addendum.  Such review or audit shall occur during normal business hours and within eighteen (18) months of the month(s) that are being reviewed or audited.

(*See* Ex. 43 to Pl.'s Reply in Support of Mot. for Class Certification at ¶¶ 3-5 (emphasis added).)

Thus, in order for Truman to ultimately receive the formula credit for a lifting at a particular

terminal, Truman must: (1) purchase the gas from a "Formula Terminal;" (2) purchase the gas for

35

delivery to a "Formula Station;" and (3) that "Formula Station," if it is a "Committed Station," must have completed its "branding commitment."

Applying the Truman Addendum to the Tulsa terminal during the fifteen months such addendum was in existence during the class period, Stephenson has failed to show that the formula price was contractually available to Truman. The Tulsa terminal is a Formula Terminal. However, the two stations relevant to the Tulsa terminal, identified in Schedule A as Location #41628036 and Location # 41628070 ("Tulsa Stations"), were "Committed Stations." (*See id.* at Schedule A at CITGO 0382593.) This means that the formula price was only available to Truman if and when those stations "completed their branding commitment." (*See id.* at ¶ 3.1.) However, Stephenson conceded in its brief that this condition was not satisfied during the class period. (*See* Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 6.) Stephenson argued instead that "[w]hile this fact [non-expiration of the branding commitments] may have limited [Truman's] use of the existing formula at Tulsa, under the terms of the addendum the formula price was available to [Truman] *for any other purchases* it chose to make."[26] This argument fails because such "other purchases" are illusory. As argued by Citgo, availability of the formula price for any "other purchases" could only have occurred if Truman acquired a new station around the Tulsa

---

[26] The expiration dates of the branding commitments for the Tulsa Stations *appear* to be before cancellation of the Truman Addendum in September 2006. (*See* Ex. 43 to Pl.'s Reply in Support of Mot. for Class Certification at Schedule A.) However, Stephenson did not make this argument. Instead, Stephenson conceded the fact of non-expiration by arguing that "this *fact* [non-expiration of branding agreements] may have limited" Truman's use of the formula price at the Tulsa terminal. (*See* Pl.'s Resp. to Def.'s Mot. to Strike Testimony of Pl.'s Proposed Expert Regarding Injury 6 (emphasis added).) Stephenson bears the burden of proving standing. Stephenson has had ample opportunity and incentive to analyze, explain, and present evidence regarding contractual availability of the formula price under the Truman Addendum, and Stephenson failed to satisfy its burden.

terminal that was not subject to a branding agreement, or if it purchased gas at the Tulsa terminal and transported it to stations closer to another terminal. Stephenson has made no showing that either event was remotely likely to occur. This argument by Stephenson requires speculation and cannot be used to establish injury.

Instead of making arguments related to the Truman Addendum itself, Stephenson attempts to shift the Court's focus to internal Citgo documents that calculated a formula price for Truman for a one-month period during January of 2006. (*See* Ex. 44 to Pl.'s Reply in Support of Mot. for Class Certification.) Accepting as true that this document reflects such a calculation, it still does not prove *contractual availability* to Truman. Stephenson's burden, for purposes of proving that it has standing to seek recovery based on its availability theory of injury, is to show that the formula price was contractually available to at least one Favored Distributor for that Favored Distributor's purchases at the Tulsa terminal. Stephenson has failed to demonstrate that the contractual conditions entitling Truman to the formula price at the Tulsa terminal were indeed satisfied during the relevant time period of July 1, 2004 to September 30, 2006. Nor has Stephenson presented any evidence that creates a disputed question of fact regarding contractual availability to Truman or 4-Front that requires resolution by a jury.

## IV.     Conclusion

Unfortunately for Stephenson, the evidence it acquired from Citgo during discovery did not support its original theory of injury – paying a discriminatory price in comparison to the price paid by a Favored Distributor at the same terminal. Its attempt to remedy this standing problem by shifting to a straight breach theory fails because such theory was untimely asserted. Its attempt to remedy this standing problem by shifting its § 2-305(2) theory of injury to mere availability of a

formula price to a Favored Distributor fails because (1) the availability theory of injury is not a concrete, actual injury for purposes of Article III; and (2) even assuming the availability theory of injury satisfies Article III's requirements, Stephenson has failed to create any triable question as to whether it suffered such an injury by virtue of contractual availability of the formula price to a Favored Distributor at the Tulsa terminal.  Therefore, Stephenson lacks standing to assert this § 2-305(2)-based breach of contract claim.

Where the only named plaintiff in a putative class action lacks standing from the outset of the case, and a class has yet to be certified, the proper course is dismissal.  *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (named plaintiff lacked standing) ("[B]ecause this is not a mootness case, in which substitution or intervention might have been possible, we remand this case to the district court with instructions to dismiss."); 1 *Herbert B. Newberg on Class Actions* § 2:7 (4th ed. 2002) ("If the plaintiff has no standing individually, then no case or controversy arises . . . .").  The Court's dismissal for lack of standing must be without prejudice.  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("Since standing is a jurisdictional mandate, a dismissal with prejudice for lack of standing is inappropriate, and should be corrected to a dismissal without prejudice.").  Stephenson's counsel has been aware of Stephenson's standing problems at least since Citgo filed its opposition to the Motion for Certification.  In addition, the Court expressed its concerns with standing at the class-certification hearing over six months ago, and Stephenson has not moved the Court for leave to add another plaintiff.  Accordingly, the Court finds no reason to allow Stephenson additional time to name another plaintiff.  *See Hammond v. Reynolds Metals Co.*, 219 Fed. Appx. 910, 915 (11th Cir. 2007)

(finding that district court did not abuse its discretion when it dismissed putative class action for lack of standing without providing opportunity to amend complaint to add plaintiffs with standing).

Plaintiff's Motion for Class Certification ("Motion for Certification") (Doc. 152) is DENIED based on Stephenson's lack of standing.  Defendant's Motion to Strike Testimony of Plaintiff's Proposed Expert Regarding Injury (Doc. 215) is DENIED, and the Court considered the availability theory and Mukamel's testimony and exhibits in reaching its conclusion regarding standing. Defendant's Motion to Strike Declaration of Alvin Smith (Doc. 199) is DENIED as premature. Defendant's Motion to Make its Class Certification Exhibits Part of the Record (Doc. 217) is DENIED, except as to those portions of class-certification hearing exhibits explained and filed as part of Citgo's Notice of Submission of Selected Exhibits Pursuant to this Court's July 15, 2010 Order (Doc. 247).[27]

This redacted Opinion and Order is entered this 14th day of September, 2010.  The sealed Opinion and Order (Doc. 265) was entered July 28, 2010.

_____
TERENCE C. KERN
United States District Judge

---

[27] Pending motions related to discovery (Docs. 224 and 262) are DENIED as moot.